*John Doe v. Catholic Relief Services*, Misc. No. 28, September Term, 2022. Opinion by Biran, J.

**STATUTORY INTERPRETATION – MARYLAND FAIR EMPLOYMENT PRACTICES ACT, MD. CODE ANN., STATE GOV'T § 20-606 – DISCRIMINATION – MEANING OF DISCRIMINATION BASED ON "SEX" –** The Supreme Court of Maryland held that the prohibition against sex discrimination in the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't ("SG") § 20-606 (2021 Repl. Vol., 2022 Supp.) ("MFEPA"), does not include a prohibition against sexual orientation discrimination. Separate and apart from its ban on sex discrimination, MFEPA expressly prohibits employment discrimination based on sexual orientation. The plain language of the statute and its legislative history demonstrate that the General Assembly intended for the separate enumerations to be distinct categories of protection for employees.

**STATUTORY INTERPRETATION – MARYLAND EQUAL PAY FOR EQUAL WORK ACT, MD. CODE ANN., LAB. & EMPL. § 3-304 – DISCRIMINATION – MEANING OF DISCRIMINATION BASED ON "SEX" –** The Supreme Court of Maryland held that the prohibition against sex discrimination in the Maryland Equal Pay for Equal Work Act, Md. Code Ann., Lab. & Empl. § 3-304 (2016 Repl. Vol.) ("MEPEWA"), does not include a prohibition against sexual orientation discrimination. MEPEWA prohibits wage discrimination based on "sex" and "gender identity." The plain language of the statute and its legislative history demonstrate that the General Assembly did not intend for the prohibition against pay disparities based on sex to encompass a ban on pay disparities based on sexual orientation.

**STATUTORY INTERPRETATION – MARYLAND FAIR EMPLOYMENT PRACTICES ACT, MD. CODE ANN., STATE GOV'T § 20-604(2) – DISCRIMINATION – EMPLOYMENT – RELIGIOUS ENTITY EXEMPTION –** The Supreme Court of Maryland held that MFEPA's religious entity exemption, SG § 20-604(2), bars claims for religious, sexual orientation, and gender identity discrimination against religious organizations by employees who perform duties that directly further the core mission(s) of the religious entity.

IN THE SUPREME COURT

OF MARYLAND*

Misc. No. 28

September Term, 2022

JOHN DOE

v.

CATHOLIC RELIEF SERVICES

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

Opinion by Biran, J.
Watts, Hotten, and Eaves, JJ., dissent.

Filed: August 14, 2023

\* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

# I

## Introduction

This Court is authorized to "answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 12-603 (2020 Repl. Vol).

On February 21, 2023, the United States District Court for the District of Maryland certified the following three questions to this Court:

1. Whether the prohibition against sex discrimination in the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606, prohibits discrimination on the basis of sexual orientation.

2. Whether, under Md. Code Ann., State Gov't § 20-604(2), the Maryland Fair Employment Practices Act applies to a religious corporation, association, education institution, or society with respect to the employment of individuals of a particular sexual orientation or gender identity to perform work connected with all activities of the religious entity or only those that are religious in nature.

3. Whether the prohibition against sex discrimination in the Maryland Equal Pay for Equal Work Act, Md. Code Ann., Lab. & Empl. § 3-304, prohibits discrimination on the basis of sexual orientation.

We heard oral argument concerning the certified questions on June 2, 2023. We now provide our answers below.

## II

## Background

### A. Statement of Facts

"The court certifying a question of law" to this Court "shall issue a certification order." CJP § 12-605(a). The certification order must contain "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]" *Id.* § 12-606(a)(2). We now summarize the facts provided by the certifying court.

Catholic Relief Services-United States Conference of Catholic Bishops ("CRS"), the defendant in the federal lawsuit, is a 501(c)(3) Catholic Church social services agency constituted by the United States Conference of Catholic Bishops. CRS follows the Catholic teaching that marriage is between one man and one woman and ordered to the procreation of children.

John Doe, the plaintiff in federal court, is a gay, cisgender man who is married to another man. In 2016, Mr. Doe attended a job fair where he met CRS recruiter Anna Cowell. The two discussed generally available positions at CRS, and Ms. Cowell later followed up with Mr. Doe about pursuing a data analyst position with CRS. In his conversations with Ms. Cowell, Mr. Doe asked whether CRS would provide health benefits to his same-sex spouse. Ms. Cowell told Mr. Doe that all dependents are covered. In June 2016, CRS hired Mr. Doe as a Program Data Analyst. In this position, Mr. Doe worked on

advancing and facilitating select business functions within CRS's Gateway business platform and project portfolio system through an online platform known as Salesforce.[1]

Over the course of his employment, Mr. Doe has held various positions at CRS, including Program Data Analyst, Gateway User Support (Advisor I), and Gateway Data Quality and Analytics Advisor (Advisor II). In those positions, Mr. Doe's responsibilities included, among other things, reporting and data analytics, providing support to CRS Gateway users, collaborating with other team members regarding development of content for trainings and presentations, and making system enhancements to Gateway. Mr. Doe's responsibilities concerning the improvement, enhancement, design, use, and training of the Gateway system mirrored those of his straight colleagues.

Upon Mr. Doe's hiring in June 2016, he enrolled his same-sex spouse through CRS's benefits enrollment system. CRS accepted the enrollment. Several months after this enrollment, Debra Jones, then Benefits and Staff Care Manager for CRS, alerted her superior, David Palasits, Acting Executive Vice President for Human Resources, that Mr. Doe had been misinformed about his spouse's eligibility for benefits and that Mr. Doe's spouse had been enrolled in error. On November 10, 2016, Ms. Jones informed Mr. Doe that CRS had mistakenly approved the enrollment of his same-sex spouse and that CRS did not provide spousal health benefits to employees in same-sex relationships.

---

[1] The certified facts provided by the district court state that Mr. Doe's position "is not the type of position that is covered by the First Amendment's ministerial exception, as that doctrine is discussed in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020)." We discuss the ministerial exception below.

3

CRS personnel and Mr. Doe subsequently conferred about a potential coverage alternative, but the parties were unable to reach an agreement. CRS terminated Mr. Doe's spouse's health benefits, effective October 1, 2017. CRS did so because it considers the provision of such benefits to be contrary to its Catholic values.

On June 1, 2018, Mr. Doe timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against CRS. On May 27, 2020, the EEOC issued a right to sue letter.

On June 12, 2020, Mr. Doe filed a lawsuit against CRS in the United States District Court for the District of Maryland. His complaint includes claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, the federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1), as well as claims under the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't ("SG") § 20-606(a)(1)(i) (2021 Repl. Vol., 2022 Supp.) ("MFEPA"), and the Maryland Equal Pay for Equal Work Act, Md. Code Ann., Lab. & Empl. ("LE") § 3-304(b)(1) (2016 Repl. Vol.) ("MEPEWA").[2]

The parties filed cross-motions for summary judgment. On August 3, 2022, the district court granted in part and denied in part the parties' cross-motions. The court ruled that CRS violated Title VII by revoking Mr. Doe's dependent health insurance because of his sex – in particular, because he was a man married to another man. The court also granted summary judgment to Mr. Doe on his federal EPA claim, on the ground that CRS "provides dependent benefits for the male spouses of female employees who perform work of similar

_____

[2] The district court's certified facts note that Mr. Doe filed additional claims against CRS under state statutory and common law, which the court subsequently dismissed.

4

skill and effort as Mr. Doe, but refused to provide such benefits to Mr. Doe because he is a man married to a man[.]"

As for Mr. Doe's claim under MFEPA, the court held that interpreting the statute would require guidance from the Supreme Court of Maryland, given that it would implicate important state public policy issues. The district court initially ruled on the MEPEWA claim, holding that CRS violated MEPEWA because a woman married to a man would not have lost spousal health insurance benefits as Mr. Doe did. On August 15, 2022, CRS moved for reconsideration of the district court's ruling on Mr. Doe's MEPEWA claim. On January 11, 2023, the district court granted CRS's motion for reconsideration and ordered the parties to confer and file proposed questions of law with respect to MFEPA and MEPEWA. On February 21, 2023, the district court certified the above three questions of law to this Court.

**III**

**Standard of Review**

"In responding to a certification from another court, this Court resolves only issues of Maryland law, not questions of fact." *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 482 Md. 223, 238 (2022) (internal quotation marks and citation omitted). In addition, we "may go no further than the question certified." *Id.* (internal quotation marks and citations omitted). As we are deciding questions of law and not reviewing a lower court ruling, our analysis necessarily is *de novo*. *Dickson v. United States*, 478 Md. 255, 260 (2022).

# IV

## Discussion

All three questions before us involve issues of statutory interpretation. Our goal in construing a statute is "to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). We "begin with the plain language of the statute" and the "ordinary, popular understanding of the English language dictates interpretation of its terminology." *Buarque de Macedo v. Auto Ins. Co. Hartford*, 480 Md. 200, 215 (2022) (internal quotation marks and citation omitted). "If the statutory language is unambiguous and clearly consistent with the statute's apparent purpose, the inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Id.* (cleaned up).

"We construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Id.* at 215-16 (internal quotation marks and citation omitted). Our analysis is "not confined to the specific statutory provision at issue on appeal." *Berry v. Queen*, 469 Md. 674, 687 (2020). Rather, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *Id.* (internal quotation marks and citation omitted). Therefore, "it may be beneficial to analyze the statute's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Id.* (internal quotation marks and citations omitted). We often review legislative history to

6

determine whether it confirms the interpretation suggested by our analysis of the statutory language, *Rowe v. Maryland Comm'n on Civ. Rts.*, 483 Md. 329, 343 (2023), although we are not required to do so if the statutory language is unambiguous. *See Wheeling v. Selene Fin. LP*, 473 Md. 356, 384-85 n.9 (2021).

If we conclude that "statutory language is ambiguous and thus subject to more than one reasonable interpretation, or where the language is unambiguous when read in isolation, but ambiguous when considered in the context of a larger statutory scheme," we "must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Macedo*, 480 Md. at 216 (internal quotation marks and citation omitted). "We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Mayor & Town Council of Oakland*, 392 Md. 301, 316 (2006); *see also Bell v. Chance*, 460 Md. 28, 53 (2018) (throughout the interpretive process, "we avoid constructions that are illogical or nonsensical, or that render a statute meaningless").

MFEPA and MEPEWA are remedial statutes. Therefore, we must construe both statutes "liberally in favor of claimants seeking [their] protection." *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 495 (2007). Relatedly, "exemptions from remedial legislation must be narrowly construed." *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016) (internal quotation marks and citation omitted).

With these principles in mind, we turn to the three certified questions before us. We have chosen to reorder the certified questions. We shall first address the questions

7

concerning the meaning of the prohibition against sex discrimination under MFEPA and MEPEWA, and then consider the question concerning the religious entity exemption under MFEPA. In addition, we exercise our discretion to rephrase the question regarding the religious entity exemption. *See* CJP § 12-604 ("The [Supreme Court] of this State may reformulate a question of law certified to it."). We shall consider the following question: What is the meaning of the phrase "to perform work connected with the activities of the religious entity," as used in MFEPA's religious entity exemption, SG § 20-604(2)?

### A. The Prohibition Against Discrimination on the Basis of "Sex" in MFEPA Does Not Itself Also Prohibit Sexual Orientation Discrimination, Which Is Separately Covered under MFEPA.

MFEPA provides that an employer may not "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment," among other reasons, "because of the individual's ... sex, ... sexual orientation, [or] gender identity[.]" SG § 20-606(a)(1)(i).

Mr. Doe argues that, for the purpose of answering the first certified question, we should read MFEPA in lockstep with Title VII's prohibition against sex discrimination. In 2020, the United States Supreme Court held that Title VII's prohibition against sex discrimination includes a prohibition against sexual orientation discrimination. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). Mr. Doe contends that, although the General Assembly amended MFEPA specifically to add sexual orientation as a protected category before the Supreme Court decided *Bostock*, *Bostock* confirmed protections that already existed under MFEPA's prohibition against discrimination on the basis of sex.

8

CRS focuses on the separate enumerations of "sex" and "sexual orientation" in MFEPA's prohibition. According to CRS, because the General Assembly made both sex discrimination and sexual orientation discrimination expressly actionable under MFEPA, the General Assembly did not understand and intend that the prohibition against sex discrimination would also prohibit sexual orientation discrimination. We agree with CRS.

1. Plain Language

There is no ambiguity in the language of SG § 20-606 as it pertains to sex discrimination and sexual orientation discrimination. MFEPA's plain terms separately prohibit both.

"Sexual orientation," as the term is used in MFEPA, means "the identification of an individual as to male or female homosexuality, heterosexuality, or bisexuality." SG § 20-101(i). "Sex" is not statutorily defined. The dictionary definition of "sex" – both at the time MFEPA was enacted in 1965 and currently – refers to a categorical (especially biological) distinction between male and female organisms. For example, Merriam Webster's Online Dictionary defines "sex" as "either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male especially on the basis of their reproductive organs and structures" or "the sum of the structural, functional, and sometimes behavioral characteristics of organisms that distinguish males and females" or "the state of being male or female" or "males or females

9

considered as a group[.]"[3] None of these definitions signal that "sex" also includes "sexual orientation."

Similarly, Webster's Third New International Dictionary, published in 1966, defined "sex" as "one of the two divisions of organic esp. human beings respectively designated male or female[.]"[4]

Furthermore, reading the prohibition against sex discrimination to include a prohibition against sexual orientation discrimination would render MFEPA's religious entity exemption, SG § 20-604(2), nugatory. That provision exempts discrimination claims against "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." Because we must read MFEPA as a whole, we seek to harmonize the meaning of "sex" with the language and purpose of the statute's religious entity exemption.

If we were to read the statutory language in the way suggested by Mr. Doe, the exemption for religious organizations would effectively be rendered a nullity. Every plaintiff who sued a religious entity employer for alleged sexual orientation discrimination would simply plead their claim as a sex discrimination claim to avoid the potential application of the religious entity exemption. We agree with CRS that "it cannot possibly

---

[3] *Sex*, MERRIAM-WEBSTER, available at https://perma.cc/5WPD-2AB3.

[4] *See Bostock*, 140 S. Ct. 1731, 1784-91, app. A & B (2020) (Alito, J., dissenting) (providing definitions of "sex" from various dictionaries throughout the decades surrounding the passage of Title VII).

have been the General Assembly's intent to enact an exemption that any plaintiff could plead around with ease."

2. Legislative History of MFEPA

We next turn to legislative history as a check on our reading of MFEPA's text. *See Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 190 (2022) ("This Court may use legislative history as a 'check' on its plain text interpretation."). To put MFEPA's legislative history in context, we briefly examine the history of the statute and its connections with Title VII.

This Court has recognized that MFEPA is "modeled on federal anti-discrimination legislation." *Molesworth v. Brandon*, 341 Md. 621, 632 (1996). MFEPA "became effective July 1, 1965 – the day before the effective date of Title VII." *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 607 (1989). When initially enacted, Title VII and MFEPA contained similar employment discrimination prohibitions. Initially, both statutes prohibited, among other things, discrimination based on sex.[5]

---

[5] *See* Act of May 4, 1965, ch. 717, 1965 Md. Laws at 1044 ("It shall be an unlawful employment practice for an employer: (a) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, creed, sex or national origin[.]") (enacting MFEPA); Civil Rights Act of 1964, Pub. L. 88-352, § 703(A)(1), 78 Stat. 241 ("It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]") (enacting Title VII).

11

For a time, MFEPA was amended to match Title VII's statutory changes so that the two statutes maintained their strong similarities. *See Molesworth*, 341 Md. at 632-33 ("[T]he title of Chapter 493 of the Acts of 1973, which reduced from twenty-five to fifteen the number of employees in the definition of 'employer,' indicates that the Act was passed to 'generally conform the State Fair Employment Practices Law to the 1972 Amendments of Title VII, Federal Civil Rights Act of 1964.'").

However, MFEPA's language did not remain materially identical to that of Title VII. The issue before us involving the addition of sexual orientation as a protected category is an example of its divergence.

The text of Title VII does not specifically prohibit discrimination based on "sexual orientation." As noted above, neither did MFEPA, initially. However, in 2001, the General Assembly amended MFEPA to add sexual orientation as a protected category. The legislative history of this amendment reflects that the General Assembly added a specific reference to sexual orientation in MFEPA because it believed MFEPA did not yet prohibit discrimination on the basis of sexual orientation. A report authored by the Special Commission to Study Sexual Orientation Discrimination in Maryland in 2000 (the "Special

Commission")[6] recited that "Article 49B[7] prohibits discrimination in employment, housing and public accommodations based on an individual's race, religion, creed, sex, age, color, familial status (housing), national origin, marital status and physical or mental disability." INTERIM REP., SPECIAL COMM'N TO STUDY SEXUAL ORIENTATION DISCRIMINATION IN MD. at 6 (2000) ("INTERIM REP."). The Special Commission continued: "The law does not prohibit discrimination based on sexual orientation." *Id.*

Further, 2001 testimony from the Maryland Commission on Human Relations ("MCHR")[8] in favor of the legislation adding sexual orientation as a protected class in MFEPA stated:

> Under Maryland's Human Relations Code, people are protected from discrimination based on race, creed, sex, age, color, national origin, marital status, physical and mental handicap in the areas of employment, housing and public accommodations. Some jurisdictions in Maryland also have laws that bar discrimination on the basis of sexual orientation. These include Howard, Montgomery, and Prince George's counties, Rockville and Baltimore City….
>
> But those who live in unprotected jurisdictions have no recourse against discrimination under Maryland Law or under Title VII of the Civil Rights Act of 1964 on the basis of sexual orientation or the perception that their

---

[6] This Commission was created by then-Governor Parris Glendening to study the impacts of sexual orientation discrimination in the state, given that there was no state prohibition against such discrimination. *See* Md. Exec. Ord. No. 01.01.2000.19 at 1-2, amended by Exec. Ord. No. 01.01.2000.22. The Commission was tasked with developing recommendations to end discrimination on the basis of sexual orientation, including drafting legislative proposals for the General Assembly. *See id.* at 3-4.

[7] Maryland's antidiscrimination laws were formerly contained in Article 49B of the Annotated Code of Maryland.

[8] The Maryland Commission on Human Relations was subsequently renamed the Maryland Commission on Civil Rights. This agency is charged with administering MFEPA and other Maryland antidiscrimination provisions.

13

sexual orientation is other than heterosexual. Maryland is a national leader in civil rights protections, but an important gap exists. Discrimination in employment, housing, and public accommodations based on sexual orientation denies equal rights.

MCHR Testimony Re: HB 307/SB 205 Antidiscrimination Act of 2001 at 1 (2001) ("MCHR Testimony").

This legislative history makes clear that the General Assembly amended MFEPA to include sexual orientation as a protected class because it believed that MFEPA, as it existed before 2001 – including its bar on sex discrimination – did not prohibit sexual orientation discrimination.[9]

This understanding is reinforced by the fact that, at the same time the General Assembly added sexual orientation as a protected category under MFEPA, it also amended MFEPA's religious entity exemption to add sexual orientation – but not sex – as a permissible basis for at least some discrimination by religious organizations. To whatever extent the General Assembly intended the religious entity exemption to apply,[10] if the General Assembly had believed that sexual orientation discrimination was also covered under sex discrimination, it presumably would have made that clear in some fashion when adding sexual orientation to the religious entity exemption.

---

[9] The effort to add sexual orientation as a protected class in MFEPA took at least 25 years. In 1976, Delegate Alverda Booth of Baltimore County sponsored the first bill to amend Article 49B to prohibit sexual orientation discrimination in employment, housing, and public accommodations. The legislation failed in committee. Multiple subsequent efforts also were unsuccessful. The long campaign to add sexual orientation discrimination to MFEPA achieved success with the Antidiscrimination Act of 2001.

[10] We consider the General Assembly's intent in enacting that exemption in answering the third question below.

14

Moreover, it is clear from the record materials before us that policymakers viewed sexual orientation as its own discrete class, and determined that it was appropriate to amend the religious entity exemption to add sexual orientation, in order to achieve a balance between the rights of individuals to be free of sexual orientation discrimination and the rights of religious organizations to further their religious beliefs. Thus, the Special Commission recommended that the General Assembly amend the exemption to include sexual orientation, given that some religious entities opposed the addition of sexual orientation as a protected class. *See* INTERIM REP. at 19. If we were to read MFEPA as Mr. Doe urges us to do, we would be ignoring the purposeful balancing that the General Assembly incorporated in MFEPA when it amended the statute in 2001.

Mr. Doe primarily relies on *Bostock*, the 2020 case in which the Supreme Court held that sex discrimination under Title VII includes discrimination based on sexual orientation (and gender identity) because "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision[.]" 140 S. Ct. at 1737. The Court's analysis rested on the principle that "because of sex" was akin to "but for" causation. *Id.* at 1739. The Court held that "[s]o long as ... sex was one but-for cause of [an employment] decision, that is enough to trigger the law." *Id.*

It remains to be seen if, in light of our holding today, the General Assembly will amend MFEPA in some fashion to harmonize it with the holding of *Bostock*. Regardless, we are convinced that the General Assembly that initially enacted MFEPA in 1965, and the General Assembly that amended MFEPA in 2001 to add sexual orientation as a

15

protected class, did not believe that sexual orientation discrimination was prohibited as a result of the ban on sex discrimination. That the Supreme Court now has told us that sexual orientation discrimination has been prohibited under Title VII all along does not mean that we can or should ignore the General Assembly's clear understanding at the time it added sexual orientation as a protected category. *See Chappell v. Southern Md. Hosp., Inc.*, 320 Md. 483, 494 (1990) (noting that this Court reads state antidiscrimination provisions in harmony with Title VII "in the absence of legislative intent to the contrary"); *see also Haas*, 396 Md. at 492 ("While it certainly is permissible to have recourse to federal law similar to our own as an aid in construction of Maryland statutory law, it should not be a substitute for the pre-eminent plain meaning inquiry of the statutory language under examination.").[11]

In sum, the prohibition against sex discrimination in MFEPA does not prohibit discrimination on the basis of sexual orientation. MFEPA prohibits sexual orientation discrimination based on its specific enumeration of "sexual orientation" as a protected class.

---

[11] In a brief filed by the American Civil Liberties Union of Maryland, FreeState Justice, GLBTQ Legal Advocates and Defenders, Lambda Legal Defense and Education Fund, Inc., Metropolitan Washington Employment Lawyers Association, National Center for Lesbian Rights, National Employment Law Project, and the Public Justice Center, Amici cite several instances in which, based on *Bostock*, courts or administering agencies in other states have read bans on discrimination based on sex in their states' analogs to Title VII as encompassing a ban on discrimination based on sexual orientation or gender identity. *See, e.g.*, *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501 (Mich. 2022) (Michigan's analog to Title VII). Unlike MFEPA, however, those state statutes (like Title VII) do not list "sexual orientation" and "gender identity" as protected categories alongside "sex."

**B. MEPEWA Does Not Prohibit Sexual Orientation Discrimination.**

The relevant language of MEPEWA provides:

> An employer may not discriminate between employees in any occupation by: (i) paying a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type; or (ii) providing less favorable employment opportunities based on sex or gender identity.

LE § 3-304(b)(1).

Similar to his argument regarding MFEPA, Mr. Doe argues that MEPEWA should be read in harmony with its federal counterpart, the EPA. Although the EPA does not include a specific reference to sexual orientation discrimination, Mr. Doe contends that the logic of *Bostock* carries over to the EPA. Therefore, he says that we should construe MEPEWA consistently with how he expects federal courts will construe the EPA, *i.e.*, reading the ban on pay disparities based on sex to encompass a ban on pay disparities based on sexual orientation.[12] Thus, Mr. Doe asserts that, "as in *Bostock*, 'but for' Mr. Doe being a man (married to a man), he would receive spousal benefits." Mr. Doe further contends that "[f]ollowing *Bostock*, the fact that MEPEWA does not explicitly mention sexual orientation, while MFEPA does, is a distinction without a difference."

---

[12] Mr. Doe cites a federal district court decision from Hawaii in which the court applied *Bostock*'s reasoning to an EPA claim at the pleading stage: "Given the Supreme Court's recent decision in the Title VII context that 'it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex,' *Bostock*, 140 S. Ct. at 1741, Plaintiff has sufficiently alleged that she has received unequal pay because of her sex." *Scutt v. Carbonaro CPAs n Mngmt Grp*, No. 20-00362, 2020 WL 5880715, at *11 (D. Haw. Oct. 2, 2020).

CRS argues that the language in MEPEWA is unambiguous. CRS contends that the prohibition against sex discrimination under MEPEWA does not include sexual orientation because, unlike in MFEPA, the General Assembly purposefully omitted sexual orientation as a protected category in MEPEWA. We agree with CRS.

1. Plain Text

We agree with CRS that there is no ambiguity in the language of LE § 3-304(b)(1). This statute specifically prohibits pay disparities based on "sex" and "gender identity." There is no mention of sexual orientation in the statute. MEPEWA does not include a definition for "sex," but does define "gender identity." *Id.* § 3-301(c) (referencing the definition of gender identity found at SG § 20-101(e), which defines gender identity as "the gender-related identity, appearance, expression, or behavior of a person, regardless of the person's assigned sex at birth, which may be demonstrated by: (1) consistent and uniform assertion of the person's gender identity; or (2) any other evidence that the gender identity is sincerely held as part of the person's core identity").

As is the case with respect to MFEPA, reference to dictionary definitions both in 1966 (when MEPEWA was first enacted) and 2016 (when MEPEWA was amended to add gender identity as a protected category) lead to the conclusion that the General Assembly likely considered "sex" to refer to "one of the two divisions of organic esp. human beings respectively designated male or female," "the state of being male or female," "males or females considered as a group," etc.[13] In addition, the fact that the General Assembly

---

[13] *See* notes 3 and 4 above and accompanying text.

expressly added protection to MEPEWA relating to "gender identity" in 2016, without also adding similar protection relating to sexual orientation, supports this reading of the plain text of the statute.

## 2. Legislative History

Legislative history also supports this conclusion. We begin by providing a brief history of the connection between MEPEWA and its federal analog. The EPA was enacted in 1963 as a part of the Fair Labor Standards Act, whereas MEPEWA was enacted in 1966. *See* TASK FORCE ON THE INTERRELATIONSHIP OF MD./FED. EMP. STANDARDS, DIV. OF LAB. & INDUS., AN EVALUATION OF THE INTERRELATIONSHIP OF MARYLAND/FEDERAL EMPLOYMENT STANDARDS at 119-21 (1978). When initially enacted, MEPEWA and its federal counterpart offered similar equal pay protections by prohibiting sex-based discrimination. *Id.* Initially, however, MEPEWA only offered protections for Maryland employees who were not covered by the federal statute and excluded all those covered by the EPA from its protection. *Id.* The General Assembly passed legislation in 1979 to extend the scope of MEPEWA by removing the exclusion. *See* Act of May 14, 1979, ch. 237, 1979 Md. Laws at 859. This history is reflective of the early relationship between the EPA and MEPEWA when the statutes were closely congruent.

In 2016, MEPEWA was amended to add the prohibition against pay disparities based on gender identity. *See* Act of May 19, 2016, ch. 557, 2016 Md. Laws at 6624-33. The General Assembly did not add sexual orientation as a protected category at that time. Mr. Doe's position would require us to conclude that the General Assembly chose not to add sexual orientation as a protected category in MEPEWA because the legislators

19

believed it was already covered under the sex-based pay disparity prohibition. We have found no evidence in the legislative history to support that conclusion. To the contrary, the National Women's Law Center suggested that the proposed legislation "could be further strengthened by adding protections from discrimination on the basis of sexual orientation." We agree with CRS that "[i]t is not plausible that the same General Assembly that, in 2001 and 2014, updated MFEPA to protect against first sexual orientation and then gender identity discrimination simply forgot to include sexual orientation as a protected category in MEPEWA or assumed that sexual orientation (but not gender identity) would be subsumed by sex."

We conclude our analysis of MEPEWA by observing that this Court historically reads state statutes that concern the same subject matter *in pari materia*. *See State v. Neger*, 427 Md. 528, 597 (2012); *see also Donlon v. Montgomery Cnty. Pub. Schs.*, 460 Md. 62, 98 (2018) ("The underlying goal of *in pari materia* is to construe two common schemed statutes harmoniously to give full effect to each enactment."). MEPEWA and MFEPA are two such "common schemed statutes." They both work to remedy forms of employment discrimination. If we were to read the prohibition against sex discrimination under MEPEWA to include a prohibition against sexual orientation discrimination, then we would need to interpret the prohibition against sex discrimination the same way under MFEPA, which we have declined to do, for the reasons stated above. In short, we agree with CRS that "[n]othing in the statutory text or the applicable legislative history suggests that the General Assembly intended 'sex' to be more capacious in MEPEWA than in MFEPA."

It may well be that, in the coming years, more federal courts will import the logic of *Bostock* from Title VII to the EPA and hold that the EPA's prohibition on wage disparities based on "sex" encompasses a ban on pay disparities based on sexual orientation and gender identity. However, our equal pay law is worded differently than the EPA. With the 2016 amendment to MEPEWA, the statute's plain terms now also prohibit pay disparities based on gender identity. Adding sexual orientation as a protected category in MEPEWA will require similar legislative action.[14] It would be improper for us to make that policy determination in lieu of the General Assembly.

## C. The Meaning of "to Perform Work Connected with the Activities of the Religious Entity" in MFEPA's Religious Entity Exemption

Under MFEPA's religious entity exemption, MFEPA's protections do not apply to claims against "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." SG § 20-604(2). Mr. Doe argues that the language of the exemption is ambiguous because it does not specify what it means to perform "work connected with the activities of the

---

[14] The General Assembly's practice, as we understand it, has been to specifically identify the categories it intends to protect in antidiscrimination statutes. As CRS points out, the General Assembly has explicitly included sexual orientation as a protected category (as well as sex and gender identity) in multiple statutes over the past decade. *See, e.g.*, Maryland Naturopathic Medicine Act, ch. 399, 2014 Md. Laws 2258, 2274 (prohibiting discrimination in licensing on the bases of, among other things, sex, sexual orientation, and gender identity); Act of April 15, 2015, ch. 43, 2015 Md. Laws 213, 215 (prohibiting discrimination in internships on the bases of those same categories and others); Act of May 8, 2020, ch. 428, 2020 Md. Laws 2235, 2238-39 (prohibiting discrimination by healthcare providers on the bases of those same categories).

religious entity." He contends that the context of the exemption and its legislative history support an interpretation that renders the exemption coextensive with the First Amendment's "ministerial exception." The ministerial exception, "grounded in the First Amendment, … precludes application of [anti-discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). This exception prevents the state from "depriving [a religious group] of control over the selection of those who will personify its beliefs." *Id.* The ministerial exception "applies to any employee whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Archdiocese of Wash. v. Moersen*, 399 Md. 637, 644 (2007) (internal quotation marks and citation omitted).

According to Mr. Doe, an interpretation of MFEPA's religious entity exemption that bars claims brought by non-ministerial employees would frustrate MFEPA's remedial purpose and violate his rights under Article 36 of the Maryland Declaration of Rights.[15]

_____

[15] Article 36 of the Maryland Declaration of Rights states, in part:

> That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights[.]

CRS contends that the exemption unambiguously exempts all claims for religious, sexual orientation, and gender identity discrimination against religious entities, because all work of every employee is "connected with" the "activities" of their employer. Using Mr. Doe's work as an example, CRS asserts that his job duties – although secular in nature – are connected to CRS's activities because they help carry out and improve the organization's operations.

We agree with Mr. Doe that the language of the exemption is ambiguous. However, we do not agree with him that the exemption is coextensive with the First Amendment's ministerial exception. Neither do we agree with CRS's contention that the exemption bars all employment discrimination claims based on religious preference, sexual orientation, and gender identity against religious entities. Giving the exemption its narrowest reasonable reading, we conclude that the General Assembly intended to exempt religious organizations from these kinds of MFEPA claims brought by employees who perform duties that directly further the core mission (or missions) of the religious entity.

---

This Court has treated Article 36 as embodying the protections guaranteed by the Free Exercise Clause of the First Amendment. *See, e.g.*, *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 585 (2001) ("The free exercise guarantee of the Maryland Constitution is in Article 36 of the Declaration of Rights[.]"); *McMillan v. State*, 258 Md. 147, 151 (1970) ("The Free Exercise Clause of the First Amendment of the United States Constitution and Article 36 of the Declaration of Rights of the Constitution of Maryland give extensive protection to religious liberty."). Thus, under both the federal and state constitutions, "the State may abridge the religious practices of any individual only upon a demonstration that some compelling state interest outweighs the interest of the individual in his religious tenets." *McMillan*, 258 Md. at 152.

23

1. <u>The Plain Language of the Exemption</u>

We agree with Mr. Doe that MFEPA's religious entity exemption is ambiguous. On one hand, "the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity" can be read broadly to apply to claims brought by any and all employees of a religious entity. After all, every employee's work presumably has at least some connection to the activities of their employer, or the employer would not pay the employee to do the work.

On the other hand, if the General Assembly had intended to exempt religious entities from employment discrimination claims based on religious preference, sexual orientation, and gender identity brought by any and all of their employees, it could have simply ended the exemption after "gender identity." It did not do so. Rather, the General Assembly exempted religious entities from these three kinds of MFEPA claims "with respect to the employment of individuals … *to perform work connected with the activities of the religious entity*." SG § 20-604(2) (emphasis added). The italicized phrase thus can reasonably be read as limiting the application of the exemption based on the type of work performed by the employee.

We believe the second of these two possible readings is the correct one because it gives effect to the italicized phrase. Interpreting these words as CRS urges would render them surplusage, contravening a fundamental canon of statutory interpretation. *See Macedo*, 480 Md. at 215-16 ("We construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.") (internal quotation marks and citation omitted). Thus, we reject CRS's contention that the

24

General Assembly intended to provide a blanket exemption for religious entities from these kinds of MFEPA claims.

However, the plain text of the statute does not provide any further guidance as to what constitutes "work connected with the activities" of a religious entity for the purpose of applying the exemption. Did the General Assembly intend to exempt only claims brought by employees who minister to worshippers, provide religious education, or otherwise spread the faith? If not, which "activities" of a religious entity implicate the exemption, and how "connected" must the "work" of an employee be to such "activities" for the exemption to apply? All of the operative words in this phrase – "work," "connected," and "activities" – can reasonably be read narrowly or broadly. In other words, the relevant language is ambiguous.

As stated above, because MFEPA is a remedial statute, we narrowly construe its exemptions. *Lockett*, 446 Md. at 424. To help understand what the narrowest reasonable reading of the exemption is, we turn to the legislative history of this provision.

2. Legislative History

MFEPA's religious entity exemption was included in the initial enactment of the legislation. At that time, it mirrored the language of Title VII's exemption, with both statutes exempting claims against a religious entity "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [religious entity] of its religious activities[.]" Act of May 4, 1965, ch. 717, 1965 Md. Laws 1043, 1046 (MFEPA); Pub. L. No. 88-352, 78 Stat. 241, 255 (Title VII). Thus, both statutes initially exempted claims against a religious entity where the plaintiff alleged

25

discrimination based on religion and where the plaintiff performed work connected with the entity's "religious activities."

In 1972, Congress passed H.R. 1746, which amended Title VII's religious entity exemption by, as pertinent here, removing the "religious" qualifier prior to "activities," so that the provision exempted claims against religious entities "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [religious entity] of *its activities.*" (Emphasis added.) *See* Pub. L. No. 92-261, 86 Stat. 103, 104. The Joint Explanatory Statement of Managers as the Conference on H.R. 1746 to Further Promote Equal Employment Opportunities for American Workers explained that "the Senate provision expanded the exemption for religious organizations from coverage under this title with respect to the employment of individuals of a particular religion in all their activities instead of the present limitation to religious activities. The House bill did not change the existing exemptions. The House receded." 1972 U.S.C.C.A.N. 2137, 2180; *see also* 118 Cong. Rec. H7539, H7567 (daily ed. Mar. 8, 1972) (statement of Rep. Erlenborn in support of the Conference Report, noting that religious institutions would have "a broad exemption for anyone employed by the religious institution rather than only those people who might be utilized in religious work per se").

In 1973, the General Assembly followed Congress's lead, amending MFEPA's religious entity exemption to remove the "religious" qualifier.[16] Thus, as of 1973, MFEPA

---

[16] The title of the 1973 amendments to MFEPA indicate that the General Assembly enacted them to "generally conform [MFEPA] to the 1972 amendments of Title VII[.]" *See Molesworth*, 341 Md. at 632-33.

26

also exempted religious discrimination claims against a religious entity by an individual whose work was "connected with the carrying on by [the entity] of its activities."

Title VII's provision today still exempts claims against a religious entity "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities." 42 U.S.C § 2000e-1(a). MFEPA's exemption, however, has been further amended. At the same time that the General Assembly added sexual orientation and gender identity as protected categories in MFEPA (2001 and 2014, respectively), it also amended MFEPA's religious entity exemption to add those categories alongside religion.[17]

The legislative history concerning the amendment to MEFPA's religious exemption in 2001 is sparse. Without referring to the exemption, MCHR's testimony concerning the Antidiscrimination Act of 2001 stated that the proposed legislation would not "force faith-based organizations to extend jobs to those who do not live in accordance with their religious beliefs." MCHR Testimony at 2.

3. Analysis

CRS contends that the removal in 1973 of the "religious" qualifier before "activities" in the exemption is significant. According to CRS, that change, in keeping with the change to Title VII's exemption, was intended to allow religious entities to make employment decisions based on religion with respect to employees whose work is

---

[17] Over time, the General Assembly also made some nonsubstantive changes to the language of the exemption (such as removing the reference to "carrying on") that have no bearing on our analysis.

27

connected to both the religious entity's religious and secular activities. Thus, in CRS's view, this means that the General Assembly (like Congress in Title VII) intended in 1973 to provide religious entities with the ability to make employment decisions based on religion not just with respect to positions that are covered by the First Amendment's ministerial exception.[18] That remained the case, CRS contends, when the General Assembly added sexual orientation and gender identity to the exemption in 2001 and 2014, respectively.

Mr. Doe acknowledges that, "[i]n 1972, Title VII's exemption was broadened to extend protections beyond 'religious activities,' but only for discrimination based on religious creed." He contends that "[a]lthough the General Assembly later added the terms 'sexual orientation' and 'gender identity,' the statutory context and legislative history do not suggest that they were intended to give religious employers *carte blanche* to discriminate." As stated above, Mr. Doe argues that the only reading of the exemption that

---

[18] Indeed, as noted above, CRS's position is that, in 1973, the General Assembly amended MFEPA to exempt all claims against religious entities for discrimination based on religion. Thus, CRS continues, when the General Assembly added sexual orientation and, later, gender identity to the exemption, it intended to similarly exempt all MFEPA claims against religious entities for discrimination based on sexual orientation and gender identity.

We acknowledge that, in a Title VII religious discrimination case, the Fourth Circuit agreed with CRS's interpretation of the 1972 amendment removing the word "religious" before "activities" in Title VII's exemption. *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) ("[A]s originally enacted, the exemption applied only to personnel decisions related to carrying out an organization's religious activities…. The revised provision, adopted in 1972, broadens the exemption to include any activities of religious organizations, regardless of whether those activities are religious or secular in nature."). As we have explained above, we decline to read the phrase "to perform work connected with the activities of the religious entity" in SG § 20-604(2) as surplusage.

avoids a constitutional problem is the one that interprets the exemption as coextensive with the First Amendment's ministerial exception.

We agree with CRS that the General Assembly did not intend to make MFEPA's religious entity exception coextensive with the First Amendment's ministerial exception. The deletion of "religious" prior to "activities" in the exemption was a material change. Prior to that deletion, the exemption (which then only covered claims of religious discrimination) arguably was coextensive with, or at least closely related to, the First Amendment ministerial exception. After the deletion, however, the exemption covered claims of religious discrimination "connected with" a religious entity's "activities," not just its "religious activities." The broader term "activities" encompasses a religious organization's secular ventures. When the General Assembly added sexual orientation and gender identity to the exemption, it did not reinsert "religious" before "activities" or otherwise change the exemption to reflect an intent no longer to exempt claims by employees who perform work "connected with" a religious entity's secular activities.

The question remains, however, given the exemption's limiting language, what type of work constitutes "work connected with" the entity's "activities?" We cannot ignore the fact that the General Assembly added sexual orientation as a protected category in MFEPA – and to its religious entity exemption – in 2001, not in 1972-73. Even if we were to assume for the sake of argument that, prior to the 2001 amendments to MFEPA adding sexual discrimination as a protected category, the General Assembly intended to permit religious entities to discriminate in favor of co-religionists throughout their organizations, American society changed radically in its views toward homosexuality between 1973 and 2001 (and

29

toward gender identity by 2014). *See generally* ANDREW R. FLORES, NATIONAL TRENDS

IN PUBLIC OPINION ON LGBT RIGHTS IN THE UNITED STATES, WILLIAMS INST., UCLA

SCH. L. 5 (Nov. 2014), available at https://perma.cc/KUE7-P3DH (discussing how

changing perceptions have led to increased public awareness and support for LGBT rights).

Thus, if ever it was appropriate to interpret the phrase "work connected with the activities

of the religious entity" to mean all types of work performed by all employees of a religious

entity, we do not believe that is the meaning the General Assembly ascribed to this phrase

when it amended the exemption in 2001 and 2014.[19] Put another way, we disagree with the

notion that, as of the time the General Assembly amended MFEPA to prohibit

discrimination based on sexual orientation (and, later, gender identity), it intended at the

same time to allow religious entities to discriminate on the basis of sexual orientation or

---

[19] The comment in MCHR's 2001 testimony that the Antidiscrimination Act of 2001 would not "force faith-based organizations to extend jobs to those who do not live in accordance with their religious beliefs," MCHR Testimony at 2, does not convince us otherwise. First, that comment did not explicitly reference the proposed amendment to the religious entity exemption or quote the exemption's language. Thus, it is not clear whether, assuming MCHR was referring to the exemption, the drafter(s) of the testimony grappled with the ambiguity in the language of the exemption that we have analyzed in this opinion. Second, the comment was seemingly broader than even the broadest possible interpretation of the exemption, as it did not limit permissible discrimination to the two kinds of discrimination that were going to be mentioned in the exemption if the proposed legislation was enacted (religious and sexual orientation discrimination). Third, in 2009, MCHR's longtime general counsel described the religious entity exemption as limited to claims by employees whose "employment is connected with the religious activities of the entity." Glendora C. Hughes, *The Evolution of Maryland's Commission on Human Relations Law*, Md. B.J. at 25 (July/Aug. 2009). Although we believe that particular interpretation of the exemption was incorrect, *see* page 29 above, it demonstrates that, if MCHR ever was of the view that the exemption allows religious entities to discriminate against all employees on the basis of sexual orientation, that view changed within a decade. In short, this isolated comment in the MCHR testimony is a thin reed upon which to base the argument that CRS advances before us.

gender identity against employees whose duties are materially indistinguishable from those performed by individuals at secular organizations, irrespective of the religious entity's core activities. The exemption's use of "connected with" links the "work" of the employee to the "activities" of the organization. As we see it, the narrowest reasonable reading of this language is that, in order for the exemption to apply, the employee's duties must directly further the core mission(s) – religious or secular, or both – of the religious entity.

Determining whether this standard is met in a particular case should not require analysis of religious doctrine or otherwise result in courts being caught in a "theological thicket." *El Bey v. Moorish Sci. Temple of Am., Inc.*, 362 Md. 339, 357 (2001) (internal quotation marks and citations omitted). We offer the following guidance to courts that are called upon to analyze the applicability of the exemption.

First, focusing on the duties of the employee and the core mission(s) of the entity entails a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances.

Second, when we refer to duties "directly" furthering the core mission of a religious entity, we mean duties that are not one or more steps removed from taking the actions that effect the goals of the entity. For example, consider a janitor who cleans the headquarters office of a religious entity which has as its core mission supplying housing to low-income communities. The janitor's work allows other staff members to work in a clean environment and better focus on their duties in helping to provide low-cost housing to the needy. In this case, the janitor's work indirectly furthers the core mission of the religious entity.

31

Contrast that example with the executive director of a medium-sized religious charity, which has as its core mission the raising of funds to build new schools in underserved communities. Assume that this person's job duties include managing other staff members to ensure that all fundraising events are scheduled, advertised, and ultimately successful. The entity uses the proceeds collected from the fundraisers to help pay for the construction of new schools. In this case, the executive director's duties directly further the entity's core mission.

Third, the size of the religious entity may be relevant. A 30-person religious non-profit may well have fewer employees whose work does not directly further the core mission(s) of the entity than an organization with a 300-person staff.

Fourth, a religious entity may have both religious and secular core missions, and more than one of each.

Fifth, in determining what constitutes a core mission of a religious entity, a trial court may consider, among other things: the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated.[20]

---

[20] This is by no means an exhaustive list of factors that a court may consider in determining the core mission(s) of a religious entity for purposes of SG § 20-604(2). Again, a court should consider the totality of the circumstances that shed light on an entity's core mission(s). However, we observe that, for purposes of MFEPA's exemption, a religious entity's core mission is not synonymous with the entity's religious doctrine. While a religious entity may genuinely subscribe to the tenet that all of its employees' work – no matter the nature of their duties – is inextricably intertwined with the values of its religion, MFEPA is a creature of the Legislature, not Maryland's religious entities. Courts must analyze the activities of a religious entity in determining the core mission(s) of the entity for the purpose of applying the exemption.

32

We believe that our interpretation of SG § 20-604(2)'s language properly gives effect to the General Assembly's intent to balance the protections afforded to religious entities under the exemption with the statute's remedial purpose to eliminate discrimination in the workplace. However, we recognize that, under our interpretation of the exemption, some employees of a religious entity may bring claims against their employer for all forms of discrimination that are actionable under MFEPA, while other employees may sue the entity for all forms of discrimination except for discrimination based on religion, sexual orientation, or gender identity. We leave it to Maryland's legislators to decide whether to retain or eliminate the difference in MFEPA's coverage among employees of the same religious entities. We may not "rewrite the law for them, no matter how just or fair we may think such a new law or public policy would be. The formidable doctrine of separation of powers demands that the courts remain in the sphere that belongs uniquely to the judiciary – that of interpreting, but not creating, the statutory law." *Stearman v. State Farm Mut. Auto. Ins. Co.*, 381 Md. 436, 454 (2004).

We do not decide whether the religious entity exemption applies to Mr. Doe's sexual orientation discrimination claim under MFEPA. That presumably will be determined in Mr. Doe's federal lawsuit. Nor do we decide whether application of the statutory exemption to Mr. Doe's claim would violate Mr. Doe's rights under Article 36 of the Maryland

Declaration of Rights, as applied to Mr. Doe. That, too, is a question to be determined in federal court, if necessary.[21]

# V

## Conclusion

The three certified questions we have considered are:

1. Whether the prohibition against sex discrimination in MFEPA, SG § 20-606, prohibits discrimination on the basis of sexual orientation.

2. Whether the prohibition against sex discrimination in MEPEWA, LE § 3-304, prohibits discrimination on the basis of sexual orientation.

3. What is the meaning of the phrase "to perform work connected with the activities of the religious entity," as used in MFEPA's religious entity exemption, SG § 20-604(2)?

For the reasons stated above, we answer the first and second certified questions in the negative. Under our interpretation of the statutory language quoted in the third certified

---

[21] The district court certified a question of statutory interpretation to this Court concerning the meaning of certain language in MFEPA's religious entity exemption. We have provided our answer in this opinion. Other questions relating to the exemption that might be raised in Mr. Doe's case in federal court, or in future cases, are not before us. In particular, it would go beyond the scope of our authority under CJP § 12-603 to opine on the constitutionality of MFEPA's exemption, as applied to Mr. Doe's sexual orientation discrimination claim. However, we think it is appropriate to observe that our interpretation of MFEPA's exemption is facially constitutional under Article 36 of the Declaration of Rights, given that a sexual orientation discrimination claim brought by a minister would necessarily be barred under both the First Amendment ministerial exception and our interpretation of the religious entity exemption. *See, e.g.*, *Koshko v. Haining*, 398 Md. 404, 426 (2007) (explaining that "a party challenging the facial validity of a statute must establish that no set of circumstances exist under which the Act would be valid") (internal quotation marks and citation omitted).

34

question, MFEPA's religious entity exemption applies with respect to claims by employees who perform duties that directly further the core mission(s) of the religious entity.

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

United States District Court
for the District of Maryland
Case No. 1:20-cv-01815-CCB

Argued: June 2, 2023

IN THE SUPREME COURT

OF MARYLAND*

Misc. No. 28

September Term, 2022

_____

JOHN DOE

v.

CATHOLIC RELIEF SERVICES

_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Dissenting Opinion by Watts, J., which Eaves,
J., joins.

_____

Filed: August 14, 2023

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Respectfully, I dissent. I would hold that the prohibitions on sex-based discrimination in both the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't (1984, 2020 Repl. Vol.) ("SG") §§ 20-601 to 20-611, and the Maryland Equal Pay for Equal Work Act ("MEPEWA"), Md. Code Ann., Lab. & Empl. (1991, 2016 Repl. Vol.) ("LE") §§ 3-301 to 3-309, bar employment discrimination on the basis of sexual orientation, as discrimination based on sexual orientation necessarily is discrimination based in part on sex. I would hold that SG § 20-604(2), the exception in the MFEPA for religious entities, is narrow and does not permit a religious non-profit to deny spousal benefits to an employee who is married to a person of the same sex and who works in data analysis.

John Doe,[1] Appellant, sued his employer Catholic Relief Services ("CRS") (a Catholic non-profit), Appellee, in the United States District Court for the District of Maryland on federal and state claims of employment discrimination after CRS denied Mr. Doe spousal healthcare benefits for his husband while providing such benefits to the husbands of his female colleagues. CRS ascribes to Catholic religious teachings, including the idea "that marriage is between one man and one woman and ordered to the procreation of children." Mr. Doe is a cisgender gay man, married to another man, who began working at CRS in 2016 as a data analyst. Mr. Doe's work "focuses on advancing and facilitating select business functions within CRS's Gateway business platform and project portfolio

---

[1]Due to privacy concerns, the trial court permitted Mr. Doe to proceed pseudonymously.

system through an online platform known as Salesforce."[2]

Initially, CRS accepted enrollment of Mr. Doe's husband in its benefits program.[3] Several months later, CRS informed Mr. Doe that this enrollment was in error and contrary to CRS's policy of not providing benefits to employees' same-sex spouses. CRS and Mr. Doe discussed possible alternative arrangements, but none was agreed on. In 2017, CRS terminated Mr. Doe's spousal health "benefits because it considers the provision of those benefits to be contrary to its Catholic values." This termination of spousal benefits precipitated Mr. Doe's lawsuit.

In light of the decision of the Supreme Court of the United States in Bostock v. Clayton County, Georgia, --- U.S. ---, 140 S. Ct. 1731, 1744 (2020), that under Title VII an employer's discrimination against an employee based on sexual orientation is "necessarily" based on sex, the District Court granted summary judgment in favor of Mr. Doe on his federal Title VII and Equal Pay Act claims. See Doe v. Catholic Relief Services, No. CV CCB-20-1815, 2022 WL 3083439, at *4, *8 (D. Md. Aug. 3, 2022), on reconsideration in part, No. CV CCB-20-1815, 2023 WL 155243 (D. Md. Jan. 11, 2023). However, without precedent from this Court on the proper interpretation of the state equivalents to those laws, the MFEPA and MEPEWA, the District Court concluded that

---

[2]The District Court held, and Mr. Doe agrees, that Mr. Doe's position "does not involve CRS's spiritual or ministerial functions"; CRS acknowledges that Mr. Doe's position does not fall within the ministerial exception but maintains that Mr. Doe's work is not secular because as a Catholic employer it views all work as in service to God.

[3]The CRS recruiter who met Mr. Doe at a job fair, leading to Mr. Doe's hiring, informed him that CRS would provide health benefits to all dependents, in response to Mr. Doe's inquiry "whether CRS would provide health benefits to his same-sex spouse."

this Court would be best suited to assess the significance of Bostock and determine the state laws' applicability to Mr. Doe's claims. See Doe, 2022 WL 3083439, at *8-9; Doe, 2023 WL 155243, at *1-2.

Although the MFEPA and MEPEWA largely mirror their federal counterparts, key differences led the District Court to certify the questions of statutory interpretation to this Court. Both Title VII and the MFEPA prohibit employment discrimination based on sex, but the Maryland law, unlike the federal one, explicitly prohibits discrimination based on sexual orientation. See 42 U.S.C. § 2000e-2; SG § 20-606. Unlike Title VII, which exempts religious entities from religious discrimination claims only, see 42 U.S.C. § 2000e-1(a), the MFEPA also includes an exception for certain religious entities "with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." SG § 20-604(2). Both the federal and Maryland equal pay laws forbid discrimination in wages and other compensation based on sex, and neither mentions sexual orientation, while only the Maryland law also prohibits such discrimination based on gender identity. See 29 U.S.C. § 206(d)(1); LE § 3-304(b)(1)(i).

### I.    MFEPA, Sex, and Sexual Orientation Discrimination

The MFEPA establishes a "State policy" of "assur[ing] all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of race, color, religions, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment[.]" SG § 20-602(1). "[T]o that

end," the State's policy is stated as one of "prohibit[ing] discrimination in employment by any person." SG § 20-602(2). Pursuant to this policy, the MFEPA prohibits an employer from (among other things) discriminating against an employee "with respect to . . . compensation, terms, conditions, or privileges of employment because of" the employee's protected traits, including sex and sexual orientation. SG § 20-606(a)(1)(i).

When interpreting statutory language, our goal is to determine legislative intent, beginning

> with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. If the statutory language is unambiguous and clearly consistent with the statute's apparent purpose, the inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application. Rather, we construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.

> We do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope. To the extent there is ambiguity in statutory language, we strive to resolve it by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. Further, we check our interpretation against the consequences of alternative readings of the text, which grounds the analysis. Doing so helps us avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

Rowe v. Maryland Comm'n on Civil Rights, 483 Md. 329, 342-43, 292 A.3d 294, 301-02 (2023) (cleaned up).  This Court has described the clear legislative intent of the Maryland human relations law, including the MFEPA, as being to "eradicate the vestiges of discrimination in the categories designated."  Equitable Life Assur. Soc. of U.S. v. Comm'n on Human Relations, 290 Md. 333, 344, 430 A.2d 60, 66 (1981).  The MFEPA is a remedial statute, which we interpret broadly "in favor of claimants seeking its protection."  Haas v. Lockheed Martin Corp., 396 Md. 469, 494-95, 914 A.2d 735, 750-51 (2007).  Further, courts interpret the MFEPA consistent with its federal corollary, absent "legislative intent to the contrary[.]"[4]  See Chappell v. S. Md. Hosp., Inc., 320 Md. 483, 494, 578 A.2d 766, 772 (1990); Peninsula Reg'l Med. Ctr. v. Adkins, 448 Md. 197, 219, 137 A.3d 211, 223 (2016) (looking to federal ADA and Rehabilitation Act cases for guidance on similar disability non-discrimination language in MFEPA).

This Court has never considered the language of the MFEPA in light of the questions presented in this case.  However, in Bostock, 140 S. Ct. 1731, 1744, the Supreme Court of the United States concluded that for purposes of Title VII, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  Looking to the meaning of the plain language of the statute, the Supreme Court articulated discrimination on the basis of sex in Title VII to mean "an employer who intentionally treats a person worse because of sex—such as by firing the

---

[4]Of course, federal courts' interpretations of Title VII are not binding with respect to our interpretation of the MFEPA.  See Haas, 396 Md. at 492, 914 A.2d at 749.

person for actions or attributes [that the employer] would tolerate in an individual of another sex[.]" <u>Bostock</u>, 140 S. Ct. at 1740. The Supreme Court stated that this analysis constituted "a straightforward rule" that is not affected by factors other than sex contributing to the decision, or the employer's treatment of women or men as a group. <u>See id.</u> at 1741. Significant to the Supreme Court's conclusion was that the relevant language focused on the individual employee subject to discrimination and not employees of certain sexes as a group. <u>See</u> <u>Bostock</u>, 140 S. Ct. at 1740-41.

The rule could also be "put differently," the Supreme Court concluded, "if changing the employee's sex would have yielded a different choice by the employer[.]" <u>Id.</u> at 1741. The Supreme Court held that under Title VII, an employee's "homosexuality or transgender status is not relevant to employment decisions" because of the necessary role that sex plays in discrimination based on such a status. <u>Id.</u> The Supreme Court provided an example of

> an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

<u>Id.</u> "Any way you slice it," the Supreme Court stated, "the employer intentionally [takes adverse action] in part because of the affected individuals' sex[.]" <u>Id.</u> at 1746. The Supreme Court reasoned that although an employer might have an "ultimate goal" of discriminating "on the basis of sexual orientation[,] [] to achieve that purpose the employer

must, along the way, intentionally treat an employee worse based in part on that individual's sex." Id. at 1742. This follows from the Supreme Court's holding that although sexual orientation and sex are distinct concepts, discrimination based on the former "necessarily entails discrimination" based on the latter. Id. at 1746-47.

Because of the breadth of the plain meaning of the statutory language used in Title VII, as confirmed by its precedent, the Supreme Court rebuffed the suggestion "that the statutory language bears some other *meaning* . . . because few in 1964 expected today's *result*," based on its plain text analysis. Id. at 1750 (emphasis in original). Such an approach, the Supreme Court stated, "impermissibly seeks to displace the plain meaning of the law in favor of something lying beyond it." Id. The Supreme Court laid out a number of problems with an analysis based on the expectations of the legislators who approved the statutory language: the difficulty of demonstrating that a result is so unexpected as to be inconsistent with that legislative intent, the possibility "that objections about unexpected applications will not be deployed neutrally[,]" and the reality that limiting "Title VII's plain text only to applications some (yet-to-be-determined) group expected in 1964" would require overturning significant precedent concerning now-obvious unlawful sex discrimination that was hotly contested when decided. Id. at 1750-53. Instead, the Supreme Court advised, "Congress's key drafting choices—to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries—virtually guaranteed that unexpected applications would emerge over time." Id. at 1753.

This Court has recognized that even if prohibited discrimination is only one of the

reasons for an adverse employment action it does not relieve the employer of liability.  See

Molesworth v. Brandon, 341 Md. 621, 645 n.8, 672 A.2d 608, 620 n.8 (1996) (explaining

that "Title VII meant to condemn even those decisions based on a mixture of legitimate

and illegitimate considerations" (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 240

(1989) (plurality opinion)) (internal quotation marks omitted).

The Supreme Court of Iowa, in Vroegh v. Iowa Dep't of Corrs., 972 N.W.2d 686,

701-02 (Iowa 2022), declined to adopt Bostock's reasoning in a case interpreting that

state's employment non-discrimination law, which, like Maryland's, forbids

discrimination based on sex, sexual orientation, and gender identity (among other

categories).  The Court relied on its controlling precedent that the prohibition on

discrimination because of sex in this context does not also prohibit discrimination based

on sexual orientation.  Id. at 700-01 (cleaned up).  The Bostock dissent was also persuasive

to the Supreme Court of Iowa.  See id. at 702.  The Court determined that by adding sexual

orientation and gender identity to the statute as protected categories, after the Court's

earlier ruling that they were not covered by the prohibition on sex-based discrimination,

the legislature sought to add those as distinct categories, whereas interpreting sex to include

those grounds would be duplicative.  See id. at 702-03.

The Supreme Court of Michigan, in Rouch World, LLC v. Dep't of Civil Rights,

987 N.W.2d 501, 512-13 (Mich. 2022), reversed its precedent that the Michigan non-

discrimination law's prohibition of discrimination because of sex did not encompass sexual

orientation, both because Bostock overruled the federal precedent on which the prior

Michigan case relied and because the Court found that Bostock "offers a straightforward

analysis" of analogous statutory text. As in Bostock, the Supreme Court of Michigan determined that even under a narrow definition of "sex," which it explicitly declined to adopt, "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex[,]" because a choice to discriminate based on sexual orientation "is dependent on the individual's sex[.]" Id. at 513. The Court concluded that sexual orientation discrimination implicates sex because determining sexual orientation necessarily relies on referencing the person's sex as well as often involving discrimination based on sex stereotypes, which courts have recognized as impermissible sex discrimination. See id.

I would hold that under the MFEPA, sex and sexual orientation are not mutually exclusive categories for purposes of employment discrimination but rather are overlapping, as well explained by the Supreme Court of the United States in Bostock. I agree with and would adopt the Supreme Court's reasoning that "[s]ex plays a necessary and undisguisable role" in an employer's decision to fire, not hire, or otherwise deny employment benefits to someone based on homosexuality, because such actions target "that person for traits or actions [the employer] would not have questioned in members of a different sex." See Bostock, 140 S. Ct. at 1737. Because "the express terms of a statute give us [the] answer" here, see id., I agree with the Majority that the language at issue is unambiguous, but I would reach the opposite conclusion as to its meaning.

This logical outcome does not mean that sex and sexual orientation are the same for purposes of MFEPA. Rather, the point is that in order to discriminate against a person because of their sexual orientation, the discriminator necessarily takes into account the

- 9 -

person's sex and the sex to which they are attracted. "In other words, the determination of sexual orientation involves both the sex of the individual and the sex of their preferred partner; referring to these considerations jointly as 'sexual orientation' does not remove sex from the calculation." Rouch World, 987 N.W.2d at 515. Indeed, how could one "identif[y] [] an individual as to male or female homosexuality, heterosexuality, or bisexuality"—the definition of sexual orientation for the MFEPA—without considering the person's sex? See SG § 20-101(i).

Mr. Doe's circumstance makes the reasoning clear. Under the test described by the Supreme Court to ascertain the cause[5] of discrimination, we "change one thing at a time and see if the outcome changes." Id. at 1739. Here, changing the sex of the plaintiff from male to female results in a different outcome, because, unlike Mr. Doe as a man married to a man, his colleagues who are women married to men receive spousal benefits. But-for Mr. Doe's sex, he would receive spousal benefits for his husband.

Just as the Supreme Court explained in Bostock, the existence of additional reasoning for the denial of benefits to Mr. Doe—his sexual orientation—does not negate this but-for causation because the MFEPA is "meant to condemn even those decisions

---

[5]The Supreme Court called this a "but-for" test, which could give the impression that it was applying a different test than we have established regarding causation under Maryland law. See Ruffin Hotel Corp. of Md. v. Gasper, 418 Md. 594, 610, 17 A.3d 676, 685 (2011). However, the Supreme Court in Bostock, 140 S. Ct. at 1742, discussed how discrimination can occur despite additional non-discriminatory factors, which is the same test that we apply in determining causation of discrimination, aligned with Supreme Court decisions in Price Waterhouse, 490, U.S. at 240 (plurality opinion), and Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003), which we have called the "motivating factor" test. See id. at 609-11, 17 A.3d at 685-86; see also Bostock, 140 S. Ct. at 1739-40.

based on a mixture of . . . considerations" when one of the considerations is impermissible discrimination. See Molesworth, 341 Md. at 645 n.8, 672 A.2d at 620 n.8. If an employer fires or penalizes an employee for being late to work, such an action obviously does not implicate the MFEPA. But this does not allow the employer to sanction only female employees for being late, while imposing no sanction on male employees. The additional reason does not preclude sex as the basis for the firing in the second case. Likewise, CRS's desire to deny Mr. Doe spousal benefits because of his same-sex marriage does not mean that the organization did not take his sex into account in making this determination.

On the question of whether Bostock is persuasive, I agree with the Supreme Court of Michigan in Rouch World. And the Michigan court's reasoning, shared by several other courts—that sex stereotyping implicates sex discrimination—further supports the conclusion that sex and sexual orientation are not mutually exclusive categories under the MFEPA. For instance, an adverse employment action against a male employee for talking about his love of his husband or wearing "feminine" colors or jewelry could be characterized both as sex stereotyping, *i.e.*, not what "real men" do, and as discrimination based on sexual orientation. See Rouch World, 987 N.W.2d at 513 n.13.

Respectfully, I am not persuaded by the Supreme Court of Iowa's reasoning in Vroegh. The interpretation of sexual orientation discrimination as necessarily implicating sex discrimination would not make the addition of "sexual orientation" as a protected category duplicative, as the Supreme Court of Iowa held. Rather, a legislature or a State General Assembly may wish to ensure that all the bases are covered and take a "belt and suspenders" approach as asserted by *amici*. This approach can be seen in laws that use

- 11 -

language that, at first glance, potentially might be perceived as duplicative but rather is intended to thoroughly cover the topic, such as the Iowa law's prohibition of discrimination on the basis of both "creed" and "religion," see Vreogh, 972 N.W.2d at 700 (quoting Iowa Code § 216.6(1)(a)) (internal quotation marks omitted). Simply because the General Assembly has determined that a person's "homosexuality . . . is not relevant to employment decisions" does not detract from the fact that "it is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex." See Bostock, 140 S. Ct. at 1741. And, unlike the Iowa Supreme Court, this Court has never ruled that the MFEPA's ban on sex-based discrimination does not include sexual orientation.

Clearly, in 2000, when Governor Parris N. Glendening established the Special Commission to Study Sexual Orientation Discrimination in Maryland, and that Commission made its recommendations for legislative changes to the MFEPA to include a bar on sexual orientation discrimination, many people viewed the MFEPA bar on sex-based discrimination as not extending to sexual orientation. See Special Comm. to Study Sexual Orientation Discrimination in Maryland, Interim Report 1, 6 (Dec. 15, 2000). It is ironic that the Majority today decides that a statute which over 20 years ago the General Assembly explicitly amended to ensure it would prevent sexual orientation discrimination now should be read more narrowly than its federal counterpart, which has never been so amended. Contrary to CRS's contentions that the addition of sexual orientation to the MFEPA in 2001 should undermine Mr. Doe's argument, I would find that it strengthens it.

To be sure, prior to Bostock, the General Assembly's addition of sexual orientation

- 12 -

to the MFEPA showed an intent that the MFEPA be interpreted differently than Title VII, at the time, with respect to sexual orientation. See Chappell, 320 Md. at 494, 578 A.2d at 772. But with Bostock, the MFEPA and Title VII are now aligned in prohibiting discrimination because of sexual orientation. And with no difference in the language of the MFEPA and Title VII with regard to sex-based discrimination, reliance on Bostock would be warranted under our precedent. See Chappell, 320 Md. at 494, 578 A.2d at 772.

Further, interpreting the ban on sex discrimination to prohibit sexual orientation discrimination is entirely in keeping with the MFEPA's goal of eradicating the "vestiges of discrimination." See Equitable Life, 290 Md. at 344, 430 A.2d at 66. This interpretation recognizes that the MFEPA is a remedial statute, entitled to broad construction in favor of those the law is intended to protect: Mr. Doe, in this case.[6]

As the plain language is unambiguous—CRS cannot discriminate against Mr. Doe because of his sexual orientation without discriminating against him "because of . . . sex"— there is no need to resort to "extratextual considerations" that might suggest another conclusion. Bostock, 140 S. Ct. at 1737. As already discussed, when in 2001 the General

---

[6]This interpretation would not, as CRS contends, make the exemption in SG § 20-604(2) obsolete because all people claiming discrimination based on sexual orientation could, according to CRS, bring sex-discrimination claims and not mention sexual orientation. This is because, although sexual orientation discrimination occurs in part "because of" sex, SG § 20-604(2) nonetheless exempts from the MFEPA (to some degree, as discussed below) a religious entity's "employment of individuals of a particular [] sexual orientation," which would always be implicated in a case where sexual orientation discrimination is concerned. In this case, Mr. Doe has alleged a cognizable sex discrimination claim, but his complaint nonetheless could be covered by SG § 20-604(2), because it concerns CRS's "employment of" Mr. Doe as an "individual of a particular [] sexual orientation[.]"

- 13 -

Assembly added "sexual orientation" as a protected class to the MFEPA, see 2001 Md. Laws 2115-2118 (Ch. 340, S.B. 205), legislators, the Special Commission, the governor, and many members of the public thought that the prohibition on sex-based discrimination did not shield employees from sexual orientation-based discrimination. I see two problems with relying on this fact to support the Majority's conclusion.

First, at that time, this Court had never specifically addressed the question. So, it was reasonable for the General Assembly to presume that sexual orientation was not covered because of some federal courts' precedent on that specific point regarding Title VII. See, *e.g.*, Wrightson v. Pizza Hut of Am., Inc., 99 F.3d 138, 143 (4th Cir. 1996) (stating, in *dicta*, that "Title VII does not afford a cause of action for discrimination based upon sexual orientation"); DeSantis v. Pac. Tel. & Tel. Co., 608 F.2d 327 (9th Cir. 1979), overruled in part by Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864 (9th Cir. 2001); Williamson v. A. G. Edwards & Sons, Inc., 876 F.2d 69 (8th Cir. 1989), overruled by Horton v. Midwest Geriatric Mgt., 963 F.3d 844 (8th Cir. 2020); and DeCintio v Westchester Co. Med. Ctr., 807 F.2d 304 (2nd Cir. 1986). The General Assembly's reliance on these federal court cases is clear from testimony on the legislation to add sexual orientation to the MFEPA by the Maryland Commission on Human Relations,[7] the government agency that enforces the MFEPA, that Marylanders then had "no recourse against discrimination under [the MFEPA] or under Title VII of the Civil Rights Act of 1964 on the basis of sexual orientation or the perception that their sexual orientation is

---

[7]The agency is now named the Maryland Commission on Civil Rights. See SG § 21-201.

- 14 -

other than heterosexual."  Maryland Commission on Human Relations, Testimony Re: HB 307/SB 205 Antidiscrimination Act of 2001 at 2 (2001).  Plus, in 2001, the criminalization of homosexual acts was still constitutional under Bowers v. Hardwick, 478 U.S. 186, 189 (1986), as the Supreme Court decision in Lawrence v. Texas, 539 U.S. 558 (2003), was two years away.

As such, the General Assembly, "like many institutions," may have "made assumptions defined by the world and time of which it [wa]s a part."  See Obergefell v. Hodges, 576 U.S. 644, 665 (2015).  But this does not mean that outdated assumptions should govern the correct interpretation of the statutory language at issue, which is what this Court must decide.  Rather, to the extent the General Assembly relied on older federal case law in interpreting Title VII, that reliance is no longer appropriate as revealed by Bostock.  See Rouch World, 987 N.W. at 508 (determining that Bostock called into question the state precedent's vitality, because that precedent relied on past federal court decisions that Bostock abrogated).

That the General Assembly wanted to be sure that sexual orientation was protected under MFEPA, in light of the legal landscape of 2001, does not mean that the legislators intended for the law's protection against discrimination "because of . . . sex" to *not* include sexual orientation.[8]  As for the intent of the General Assembly in 1973 when the statute

---

[8]That "sex" and "sexual orientation" are distinct concepts and treated as such by the General Assembly, as the Majority states, see Maj. Slip Op. at 14, does not alter the broad nature of the language of the MFEPA, which operates to prohibit employment discrimination due to sexual orientation that necessarily occurs because of sex.  See Bostock, 140 S. Ct. at 1746-47 (describing that "when Congress chooses not to include any

was originally enacted, akin to its federal counterparts, the General Assembly may not have been "thinking about many of the Act's consequences that have become apparent over the years . . . . But the limits of the drafters' imagination supply no reason to ignore the law's demands." Bostock, 140 S. Ct. at 1737. Like Congress with Title VII, the General Assembly in 1973 used "starkly broad terms" to create a "sweeping standard" prohibiting employment discrimination because of sex, and no amendments to the text since then show an intent to adopt "a more parsimonious approach[,]" *i.e*., a more limited approach. See id. at 1753, 1739. Simply put, the General Assembly's addition of sexual orientation to the MFEPA in 2001 showed an intent to ensure people were protected from employment discrimination based on sexual orientation, which does not bear on the question of how the plain text regarding discrimination "because of . . . sex" operates. See id. at 1747, 1750-53 (discussing why speculation about the reasons why particular words were or were not included in Title VII or other statutes does not displace the plain text meaning of the language at issue).

## II. The Scope of the MFEPA and the Activities of a Religious Entity

The scope of the MFEPA is limited—the "subtitle does not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." SG § 20-604(2). When originally

---

exceptions to a broad rule, courts apply the broad rule" and that despite the conceptual distinction between sex and sexual harassment, Title VII's prohibition on discrimination because of sex prohibits sexual harassment).

enacted in 1965, the statute exempted only religious entities' "employment of individuals of a particular religion" for "religious activities" of the entity. 1965 Md. Laws 1046 (Ch. 717, H.B. 333). In 1973, the General Assembly amended the MFEPA to broaden the exemption for religious entities by removing "religious" before the word "activities." See 1973 Md. Laws 1104 (Ch. 493, S.B. 1180). The General Assembly indicated that the change was to keep the MFEPA in conformity with Title VII, which Congress amended in 1972 in the same way.

In 2001, the General Assembly amended the MFEPA to prohibit employment discrimination based on an individual's sexual orientation. See 2001 Md. Laws 2115-2118 (Ch. 340, S.B. 205). This amendment also added "sexual orientation" to the exemption for religious entities, so that such entities were exempt from the MFEPA regarding "employment of individuals of a particular religion or sexual orientation to perform work connected with the activities of the religious entity." Id. at 2118.

We have held that a prior version of this section did not authorize discrimination by religious entities based on an employee's religion, but rather left them outside the scope of the MFEPA. See Montrose Christian School Corp. v. Walsh, 363 Md. 565, 581, 770 A.2d 111, 120 (2001). In ascertaining whether Montgomery County's local non-discrimination ordinance, and its exemption for religious employers, conflicted with the MFEPA, we described the religious entities' exception in MFEPA as "broad" in comparison to the Montgomery County law, which only excluded religious entities' religious discrimination in employment related to "purely religious functions." See Montrose, 363 Md. at 580, 770 A.2d at 120. In determining that the county ordinance's focus on "purely religious

- 17 -

functions" was constitutionally impermissible, this Court wrote:

> it is obvious that the provision effectively contains no exemption allowing religious organizations to employ only persons of a particular religion. Although the first sixteen words of [the ordinance] ostensibly allow religious organizations "to hire and employ employees of a particular religion," the next five words limit the authorization to the hiring of employees "to perform purely religious functions." The limitation effectively nullifies the exemption. . . . the constitutional free exercise guarantee restricts governmental interference with a religious organization's hiring and firing of employees who are involved in the religious activities of the organization.

Id. at 594, 770 A.2d at 128.

The Supreme Court of the United States has crafted the "ministerial exception" to ensure the First Amendment's protection of religious entities' right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2055 (2020) (quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. America, 344 U.S. 94, 116, (1952)) (internal quotation marks omitted). The Court described the ministerial exception as a rule to ensure that courts "stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." Id. at 2060. In assessing which employment positions are entitled to this exception, the Supreme Court concluded, a flexible approach is necessary, considering a variety of factors but focused on "what an employee does," and that teachers at religious schools qualify for the exception. See id. at 2066-68.

This Court has narrowly applied both the religious discrimination exception in Title VII and the ministerial exception, in recognition of the fact that to "categorically insulate religious relationships from judicial scrutiny" would lead to impermissible preferential

treatment for religious entity employers.  Prince of Peace Lutheran Church v. Linklater, 421 Md. 664, 686-87, 28 A.3d 1171, 1183-84 (2011) (cleaned up).  In Prince of Peace, in the course of determining that the ministerial exception did not prohibit some of the plaintiff's sex-based discrimination claims against a religious school, this Court approvingly quoted the Ninth Circuit's analysis that the exemption in Title VII "permits a religious entity to restrict employment 'connected with the carrying on . . . of its activities' to members of its own faith," without "remov[ing] race, sex, or national origin as an impermissible basis of discrimination against employees of religious institutions."  Id. at 687, 28 A.3d at 1183 (quoting Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 945 (9th Cir.1999)) (internal quotation marks omitted).  This Court explained that an over-broad application of such exemptions "not only neglects but actually may intrude upon" the purposes of the U.S. Constitution's religion clauses, because "[d]eclining to impose neutral and otherwise applicable tort or contract obligations on religious institutions and ministers may actually support the establishment of religion, because to do so effectively creates an exception for, and may thereby help promote, religion."  Id. at 687-88, 28 A.3d at 1184 (cleaned up).

In another case applying the ministerial exception to Title VII, this Court described it as applying "to any employee whose 'primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship.'"  Archdiocese of Washington v. Moersen, 399 Md. 637, 644, 925 A.2d 659, 663 (2007) (quoting Rayburn v. General Conf. of Seventh–Day Adventists, 772 F.2d 1164, 1169 (4th Cir. 1985)).  This is the "primary duties" test, with

the exception's application dependent not on ordination or title but the function of the position. Id. at 644, 925 A.2d at 663. We described Montrose as recognizing the exception. See id. at 644, 925 A.2d at 663. We concluded that the exception did not apply, permitting a church organist's discrimination claim, because the role only required the ability to play the organ and no religious training or qualification, nor did the organist engage in any religious instruction, supervision, or leadership. See id. at 655, 925 A.2d at 669.

Addressing a challenge to the Title VII exemption for religious entities facing religious discrimination claims, the Supreme Court of the United States has held that the exemption is constitutional. See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 330 (1987). A non-profit gym, run by entities affiliated with The Church of Jesus Christ of Latter-day Saints, fired a long-time building engineer "because he failed to qualify" as a member of the church. Id. The fired employee sued the gym, asserting religious discrimination, and claiming that the exemption in Title VII for religious entities and religious discrimination could not apply to nonreligious jobs without violating the Establishment Clause. See id. at 331. The Supreme Court concluded that the government can "accommodate religious practices . . . without violating the Establishment Clause" in some circumstances, and that the exemption was geared to that legitimate goal without crossing the line, in that case, to "an unlawful fostering of religion[.]" Id. at 334-38 (cleaned up). The Court also held that the exemption did not run afoul of equal protection requirements. See id. at 338-39.

Interpreting a state law similar to the MFEPA, the Supreme Court of Washington determined that an exemption for religious non-profit organizations from that law, when

applied to a gay male applicant, has to be limited by the ministerial exception. See Woods, 481 P.3d at 1067, 1069-70. A lawyer seeking a job with a Christian non-profit that served the homeless "disclosed that he was in a same-sex relationship[,]" which the organization told him "was contrary to biblical teaching" and led to the rejection his application. See id. at 1063. The lawyer brought a claim under the Washington state non-discrimination law, which prohibits discrimination on the basis of sexual orientation, but the trial court granted summary judgment to the non-profit because of the exemption from the law for religious non-profits. See id. The Supreme Court of Washington concluded that the non-discrimination law was constitutional as applied to the lawyer only when interpreted through the lens of the ministerial exception articulated by the Supreme Court of the United States in Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171 (2012), and Our Lady of Guadalupe School. See Woods, 481 P.3d at 1070. Applying the ministerial exception analysis was necessary, the Court held, because of the need to "balance[] the competing rights advanced by" the lawyer and the religious non-profit: the former's fundamental rights to his sexual orientation and to marry on the one hand, and the latter's right to exercise its religious beliefs on the other. Id. at 1069. The Supreme Court of Washington remanded the case for the trial court to assess whether the position for which the lawyer had applied qualified as ministerial. See id. at 1070.

In keeping with our precedent of narrowly interpreting the Title VII/MFEPA religious discrimination and ministerial exceptions and the legislative history of the statute, I would hold that SG § 20-604(2) does not permit a religious non-profit entity to deny spousal benefits to Mr. Doe, who is married to a person of the same sex and works in data

- 21 -

analysis and business platform support, because Mr. Doe's claim does not pertain to his "employment" as a person of any particular gender identity or sexual orientation to perform work connected with the activities of the religious entity. I would conclude that SG § 20-604(2) bars claims with respect to the extending or offering (or terminating) of the employment of a person of a particular sexual orientation or gender identity to perform work connected with the activities of a religious entity. Because Mr. Doe's claim does not involve an issue with respect to him being offered or denied employment, *i.e.*, an issue of his employment to perform work, I would conclude that his claim is not barred.[9]

This interpretation gives effect to the ordinary meaning of the language of the exemption. As in any plain language analysis, I would turn to the dictionary definition of the words at issue. Although the word employment is a noun, it derives from the verb "employ." The word employment refers to "the act of employing" or "the state of being employed." *Employment*, American Heritage Dictionary (2022), https://www. ahdictionary.com/word/search.html?q=employment [https://perma.cc/R8ZB-BPCQ]; *Employment*, Merriam-Webster (2023), https://www.merriam-webster.com/ dictionary/employment [https://perma.cc/3NN4-BPC5]; *Employment*, Oxford English Dictionary (2023), https://www.oed.com/dictionary/employment_n?tab=meaning _and_use#5536491 [https://perma.cc/ZLX3-D5FY]; *Employment*, Dictionary.com

---

[9]This holding does not expressly answer the certified question as phrased, *i.e.*, whether the exemption of SG § 20-604(2) applies to all of CRS's hiring and employment decisions, or only those that are religious in nature. But, this Court "may reformulate a question of law certified to it." Md. Code Ann., Cts. & Jud. Proc. (2006, Repl. Vol. 2020) ("CJ") § 12-604.

(2023), https://www.dictionary.com/browse/employment [https://perma.cc/D78R-7LSM]; see also *Employment*, Black's Law Dictionary (11th ed. 2019). As a verb, employ is defined as "to use or engage the services of" or "provide with a job that pays wages or a salary" —*i.e.*, hiring or engaging an individual to perform work. *Employ*, Merriam-Webster (2023), https://www.merriam-webster.com/dictionary/employ [https://perma.cc/P6B2-C7T6].

It is plain from the wording of the exemption that the word "employment" applies to the religious entity's hiring or engaging an employee, meaning that the exemption bars claims with respect to the hiring of an individual of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity. See id.; § 20-604(2). In other words, MFEPA does not apply to the hiring or engaging of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity. That the word employment is used to apply to the act of hiring (or firing) is readily apparent from the plain language of the exemption. See Prince of Peace, 421 Md. at 703, 28 A.3d at 1193 (Adkins, J., concurring) (assessing fired religious school teacher's claims); Moersen, 399 Md. at 647, 925 A.2d at 664-65 (fired church organist); Montrose, 363 Md. at 571-73, 770 A.2d at 115 (fired religious school teachers). Read without the words "particular religion, sexual orientation, or gender identity," the exemption states that the MFEPA "does not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals . . . to perform work connected with the activities of the religious entity." Under the plain language of the exemption, Mr. Doe's claim is not barred because he is not

an applicant for employment, nor has he been fired; his claim does not involve his employment as the term "employment" is used in the exemption.

As delved into at oral argument, the language of SG § 20-604(2) pertaining to the "activities of the religious entity" is ambiguous.[10]  The parties focused on the definition of the word "activities" and the significance of the General Assembly's amendment of the statue deleting the word religious as a modifier.  According to CRS, the exemption could be interpreted to mean that a religious entity like CRS has broad ability to discriminate when it comes to employment and sexual orientation because all jobs involve "activities of the religious entity[,]" such as the hypothetical discussed at oral argument involving the position of janitor at a faith-based soup kitchen.  Or, according to Mr. Doe, the language could be interpreted to mean something narrower, applying only to a subset of employees, because the language of "to perform work connected with the activities of the religious entity" ought to have some real meaning.

In my view, the language of SG § 20-604(2) demonstrates that the exemption is designed to protect religious organizations like CRS from being forced to employ people for positions where there would be a conflict or tension, due to the person's sexual orientation or gender identity, between the religious entity's ability to carry out its activities, and having the person perform work in the context of a particular position.[11]  The

---

[10]On this point, I agree with the Majority's analysis.  See Maj. Slip Op. at 27-31. However, I respectfully disagree as to the extent of the exemption.

[11]With that in mind and in light of present confusion as to the interpretation of the statute, I would respectfully recommend that the General Assembly revisit the language of SG § 20-604(2).

language of the statute could not have been intended to allow a religious entity to employ and pay employees less or treat employees differently simply because they are of a particular sexual orientation or gender identity regardless of the definition of the term "activities of the religious entity." To accept CRS's broad interpretation of SG § 20-604(2) would be to allow religious organizations to hire people who are gay and then treat them as second-class employees by paying them less and giving them fewer benefits than their heterosexual counterparts. To accept Mr. Doe's interpretation would mean that this would be permissible only where the activities are religious in nature. In my view, either outcome would be at odds with the MFEPA's intent to eradicate all forms of discrimination, and rather, would in effect result in discrimination in the workplace if the exemption were interpreted to apply to benefits, pay, and working conditions of employment rather than to the employment of individuals, *i.e.*, hiring or not hiring or firing, as indicated by its plain language. If a person of a particular sexual orientation or gender identity can perform work, like any other employee, without affecting a religious entity's activities, the person should not be discriminated against.

From my perspective, the plain language of the exemption interpreted in its narrowest form bars claims against religious entities with respect to the hiring (or not hiring) of individuals of a particular sexual orientation or gender identity, and does not permit a religious entity to discriminate in its treatment of employees to whom the religious entity has already offered employment and established an employer-employee relationship, unless the removal or termination of employment is at issue. It is at the threshold activity of the employment of an individual where a religious entity is permitted to decide whether

hiring or offering work to an individual of a particular sexual orientation or gender would impact or affect the activities of the entity and be protected from a discrimination claim for an employment decision. Because Mr. Doe's claim does not involve a claim with respect to his employment to perform work, his claim is not barred.

It may well be that a future claim could involve the offering or denial of employment to an individual of a particular sexual orientation or gender identity to perform work connected with the activities of a religious entity and the Court would be faced with the necessity to define the phrase "work connected with the activities of the religious entity." Given that the parties as well as the Majority have addressed this language of the exemption, I would offer the following. I would conclude that SG § 20-604(2) bars claims for sexual orientation or gender identity discrimination with respect to the employment of an individual, of a particular sexual orientation or gender identity, to perform work that would affect the religious entity's ability to carry out its essential activities. In other words, I would hold that SG § 20-604(2) does not permit a religious non-profit entity to discriminate in the employment (the hiring or firing) of an individual of a particular sexual orientation or gender identity where the individual's work would not affect the religious entity's essential activities. In my view, SG § 20-604(2) does not allow a religious non-profit to discriminate against an employee based on sexual orientation where the employee's performance of work would not affect the religious entity's essential activities. As such, the exemption would not permit CRS to deny spousal benefits to Mr. Doe, who is married to a person of the same sex and works in data analysis and business platform support, because (based on what I can discern from the certified facts) Mr. Doe's

performance of data analysis work does not affect CRS in carrying out any of its essential activities.[12]

From my perspective, the focus must be on the requirements of the position (the work performed in the position)—not the job's general nature as religious or not, as phrased in the certified question—and looking at whether its performance by an employee of a particular sexual orientation would affect the essential activities of the religious entity. Obviously, a job that involved proselytizing could fall into that category, but so could non-ministerial roles such as director of communications or spokesperson, depending on the religious entity's activities and the position's requirements. My focus on the essential activities of the religious entity stems from the text of SG § 20-604(2) and the ministerial exception's concern with the "significant latitude" a religious entity has "in its employment decisions when the employee in question has duties that are integral to the religious mission." Moersen, 399 Md. at 644, 925 A.2d at 663.

What is clear in this case, though, (based on the certified facts) is that Mr. Doe's performance of duties as a data analyst does not conflict with, hinder, or affect any of CRS's essential activities, *i.e.*, Mr. Doe's sexual orientation is irrelevant to his work as a data analyst and has no impact on CRS's activities. As with the ministerial exception, the focus must be on the primary duties of the job, not its title, which could render CRS exempt from the MFEPA in the context of roles that broadly involve primary duties "of teaching,

---

[12]Of course, if there were factual questions still to be resolved or relevant facts that were not included in the facts certified to this Court, I would follow the Majority's approach of not applying an interpretation of the exception to the facts of the case.

spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." See Moersen, 399 Md. at 644, 925 A.2d at 663 (cleaned up). Even the broadest understanding of those duties would not include Mr. Doe's role as a data analyst, and he has no role in the governance of CRS. Plainly, Mr. Doe's is not a job in which his sexual orientation would affect any of CRS's essential activities. As described by the District Court, Mr. Doe's role "does not involve CRS's spiritual or ministerial functions" and Mr. Doe's sexual orientation does not appear to have any discernable impact on any of CRS's essential activities. Doe, 2022 WL 3083439, at *6.

Although Mr. Doe has not explicitly contended that application of the exemption in SG § 20-604(2) is unconstitutional on equal protection grounds as applied to him, he has encouraged us to avoid addressing the issue of constitutionality under our doctrine that, where "a statute is susceptible of two reasonable interpretations, one of which would involve a decision as to its constitutionality, the preferred construction is that which avoids the determination of constitutionality." Curran v. Price, 334 Md. 149, 172, 638 A.2d 93, 104-05 (1994) (citation omitted). Essentially, Mr. Doe argues that SG § 20-604(2) should be interpreted narrowly so as to avoid the constitutional question of whether the exception burdens his fundamental rights through differential treatment of similarly situated persons. See Ehrlich v. Perez, 394 Md. 691, 715-18, 908 A.2d 1220, 1234-36 (2006). In light of the competing interest of religious liberty, a constitutional question cannot be avoided in its entirely. But, in my view, the language of the statute can be interpreted consistent with the framework that both the Supreme Court of the United States and this Court have

- 28 -

established to sufficiently balancing these competing interests using a slightly different version of the ministerial exception.

Although the denial of benefits by CRS is not government action that would implicate an equal protection issue, the government action at issue here is the General Assembly's enactment of a sexual orientation non-discrimination law for employment, while excluding some employees from accessing its relief solely based on the employer's religious nature. That the government, through a broad interpretation of the exemption, may completely remove an employee like Mr. Doe from the protection of the law is one side of the issue, and, as argued by the Attorney General in his *amicus* brief, could conflict with the requirement that our laws "must comply with the . . . Fourteenth Amendment and . . . the Maryland Declaration of Rights."[13] Harrison-Solomon v. State, 442 Md. 254, 287, 112 A.3d 408, 428 (2015) (citations omitted).

I would agree with the Supreme Court of Washington's reasoning in Woods, 481 P.3d at 1067, that there must be some limiting factor on an employment non-discrimination law's exemption of religious entities for sexual orientation discrimination. Otherwise, as that Court held, the exemption in the law would burden the job applicant's fundamental

---

[13]The Fourteenth Amendment states, in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." Article 24 of the Maryland Declaration of Rights provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Although "Article 24 and the Fourteenth Amendment are independent and capable of divergent effect," we generally "interpret Article 24 in *pari materia* with the Fourteenth Amendment[.]" Tyler v. City of Coll. Park, 415 Md. 475, 499-500, 3 A.3d 421, 434-35 (2010) (citations omitted).

rights to his sexual orientation and to marriage. See Woods, 481 P.3d at 1066. The same can be said here regarding Mr. Doe. In Woods, 481 P.3d at 1064, the state employment non-discrimination statute excluded all religious organizations from its definition of covered employer. According to CRS, this difference, along with differences between the respective state constitutions, ours and Washington's, make Woods, unpersuasive. I disagree. Like the Supreme Court of Washington, I would conclude that reasonable grounds exist for the MFEPA exemptions, but this does not mean the exemption can be as unlimited as CRS contends.

The need for some limitation flows from at least three sources.[14] First, as an exception to a remedial statute, SG § 20-604(2) must be read narrowly. See Haas, 396 Md. at 494-95, 914 A.2d at 750-51. The language in question is ambiguous, as discussed, and the exclusion contradicts the overall goal of the MFEPA to eradicate discrimination. See Equitable Life, 290 Md. at 344, 430 A.2d at 66. The constitutional issues also prevent the strict plain text approach urged by CRS. Further, our precedent instructs that this Court read exemptions in the employment discrimination context more narrowly than some other

---

[14]The secondary sources cited by Mr. Doe—the article written by the Maryland Civil Rights Commission's counsel and the employment treatises—do not add much insight, even as they support this conclusion. Similarly, the materials associated with the procurement law amendment, H.B. 425, provide minimal support. The correspondence and testimony regarded only that bill, and not the language in the MFEPA. However, opinion letters from the Attorney General's office regarding H.B. 425 did reference Title VII and the ministerial exception, which provides additional support for the idea that the General Assembly (through its legal advisors) has looked to the ministerial exception in these kinds of circumstances. This is reflected in the proposed language of that bill which included an exception that approximated the ministerial exception. See H.B. 425, 2003 Leg., 417th Sess. (Md. 2003).

jurisdictions.  See Prince of Peace, 421 Md. at 687-90, 28 A.3d at 1183-86.

Second, by adding sexual orientation to the MFEPA along with the exemption in

SG § 20-604(2), the General Assembly attempted to simultaneously tackle discrimination

against employees based on sexual orientation while ensuring such legislation survived

constitutional attack on freedom of religion grounds.[15]  See Special Comm. to Study Sexual

Orientation Discrimination in Maryland, Interim Report 19 (Dec. 15, 2000) (stating that

sexual orientation would be added to the MFEPA exemption for religious entities and that

"[n]o similar civil rights statute that provides protection from discrimination on the basis

---

[15]Otherwise, the report of the governor's special commission on sexual orientation discrimination does not provide insight into the statutory meaning at issue here.  The report recommended that "legislation be introduced to amend Article 49B[] to prohibit discrimination in employment, housing and public accommodations based on sexual orientation" and that such legislation "add sexual orientation to the exemptions that currently exist in" the article including "the religious exemption" now found at SG § 20-604(2).  Special Comm. to Study Sexual Orientation Discrimination in Maryland, Interim Report 22 (Dec. 15, 2000).  Describing the exemptions in the MFEPA at the time, the report stated that "religious organizations are also exempt from the law." Id. at 7.  Mr. Doe is correct that the report references Government Accountability Office reports on state-level non-discrimination laws that included sexual orientation and the proposed federal Employment Non-Discrimination Act, which would have added sexual orientation to Title VII.  However, the exemption in that bill is described in the report as "generally exempt[ing] religious organizations" and "exempting religious organizations to the extent they are engaged in religious activities" with the caveat that such exemption "would not be available where an employee's duties for a religious organization pertain solely to an activity that generates 'business taxable income' unrelated to the organization's religious activities."  U.S. Gov't Accountability Off., GAO/OGC-98-7, Sexual-Orientation-Based Employment Discrimination: States' Experience With Statutory Prohibitions 5 (Oct. 23, 1997); U.S. Gov't Accountability Off., GAO/OGC-00-27R, Sexual-Orientation-Based Employment Discrimination: States' Experience With Statutory Prohibitions Since 1997 3 (Apr. 28, 2000).  That the federal legislation exempted discrimination in employment by religious entities on the basis of sexual orientation except in circumstances where the employee's activity generates "business taxable income" does not support Mr. Doe's interpretation.

of sexual orientation has ever been struck down by a court as violating the constitutional guarantee of freedom of religion"). This shows that the General Assembly was seeking to ensure that the legislation comported with constitutional protections for religious entities' employment practices, not to give them a free pass to discriminate.

Finally, the Maryland and federal constitutional guarantees of equal protection and religious liberty suggest a narrower interpretation of the exemption than that advocated by CRS. Under Maryland Declaration of Rights Article 19, every person is entitled to a remedy in the law for injury, and Article 24 requires equal protection of the law. Read in tandem with Article 36's[16] instruction that the government may infringe a person's or entity's religious liberty when that liberty is used to "injure others in their natural, civil or religious rights[,]" the government, having decided that sexual orientation-based discrimination is serious enough to prohibit for all other employers, cannot decide to wholly exempt religious entities from that same requirement beyond what is reasonable to avoid conflict with religious liberty.[17]

---

[16]In relevant part, Article 36 reads:

[N]o person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights[.]

[17]Of course, CRS is correct that the Maryland Declaration of Rights, through Article 36, acts to permit government action on the basis of religion when a person "under the color of religion . . . injure[s] others in their natural, civil or religious rights" because the Article otherwise prohibits the State from "molest[ing]" "by any law" a "person or estate, on account of his religious persuasion or profession, or for his religious practice[.]" Put simply, the State cannot use laws to target a person's religious practices unless those

I would conclude that the appropriate limiting principle emanates from the ministerial exception, not from the distinction between religious and non-religious activities. This means that the nature of the work matters, as SG § 20-604(2) constitutes a version of the court-created ministerial exception in relation to sexual orientation and the employment of individuals to perform work connected with the activities of the entity at issue.[18] In my view, essentially, the General Assembly sought to protect religious entities' right to govern themselves as extensions of the church, while advancing the compelling government interest of stopping discrimination. This is exactly the task the ministerial exception was crafted to address. However, in light of our precedent strictly limiting those claims that are excluded by the ministerial exception for other categories of discrimination, as in Moersen, and the General Assembly's sensitivity as to how sexual orientation claims could implicate freedom of religion rights, SG § 20-604(2) appears to offer a different exception to religious entities facing claims of sexual orientation discrimination than the ministerial exception does in other contexts.[19] But this does not support the expansive reading espoused by CRS.

---

practices are infringing on the rights of others—such as by discriminating in employment. Even so, CRS fails to appreciate the interplay between the MFEPA, Article 36, and other provisions of the Maryland and United States Constitutions. Most significant is the fact that Article 36 itself shows the limits of religious freedom when such exercise would "injure" the rights of others.

[18]As discussed below, the different considerations regarding religious discrimination in this context leads to distinct treatment of the different types of discrimination addressed by SG § 20-604(2).

[19]So, for example, if hypothetically Mr. Doe were a church organist like in Moersen, and brought an MFEPA claim for sexual orientation discrimination after being terminated, SG § 20-604(2) might lead to a different result than in Moersen, where we concluded the position was not ministerial.

The interpretation of SG § 20-604(2) as described above would avoid a potentially nonsensical outcome that would follow from CRS's reading: that Title VII provides greater protection for the sexual orientation of employees of religious entities than the MFEPA, when the General Assembly has specifically amended the MFEPA to address sexual orientation-based discrimination in Maryland and Congress took no such step regarding Title VII. Instead, I would adopt the above-described approach in interpreting the language "with respect to the employment of individuals" and "work connected to the activities of the religious entity" to address "the need for a careful balance between the religious freedoms of the sectarian organization and the rights of individuals to be free from discrimination in employment." Woods, 481 P.3d at 1069 (citing Our Lady of Guadalupe, 140 S. Ct. at 2060-66, and Hosanna-Tabor, 565 U.S. at 188-96). The General Assembly's actions on the MFEPA over the years have shown an intent to conform it to Title VII and occasionally increase the MFEPA's protections beyond those of Title VII. See, e.g., Haas, 396 Md. at 491-500, 914 A.2d 748-54 (declining to adopt the Supreme Court's interpretation of statutory language in Title VII in interpreting an analogous Maryland statute on employment discrimination so as to broaden protections and promote conciliation). My conclusion is consistent with that dynamic, as the MFEPA would continue to be construed largely consistent with Title VII.

To be sure, the Supreme Court of the United States has held that the statutory exemption in Title VII, for claims of religious discrimination against religious entity employers, allows a religious entity to hire only co-religionists without offending the establishment clause. See Amos, 483 U.S. at 330-31; see also Prince of Peace, 421 Md. at

- 34 -

687, 28 A.3d at 1183 (holding that the exemption "permits a religious entity to restrict employment 'connected with the carrying on . . . of its activities' to members of its own faith" (cleaned up)).  Although SG § 20-604(2) excludes a religious employer like CRS from application of the MFEPA "with respect to the employment of individuals of" both "a particular religion" and "sexual orientation," the exclusions implicate different interests. Above and beyond ministerial positions, a religious employer may have a strong interest in hiring co-religionists generally for all positions, as in Amos, or specifically for certain roles within the organization that do not involve ministerial duties, *i.e.*, "teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship."  Moersen, 399 Md. at 644, 925 A.2d at 663 (cleaned up).  This same interest is not implicated by discrimination claims that do not involve the religion of the employee (or applicant).

The MFEPA's exemption for religious entities regarding sexual orientation discrimination does not implicate the same concerns.  By including sexual orientation within SG § 20-604(2), the General Assembly showed an intent to leave outside of the scope of MFEPA, employment actions regarding hiring and firing where sexual orientation is concerned which would elsewise be permitted if based on other protected categories not included in the exemption.  This does not indicate, though, an intent on the General Assembly's part to allow carte blanche discrimination in the area of sexual orientation by religious employers.

### III.    MEPEWA and Sexual Orientation

The MEPEWA prohibits (among other things) an employer from "discriminat[ing]

- 35 -

between employees in any occupation by: [] paying a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character[.]" LE § 3-304(b)(1)(i). Under MEPEWA, "'[w]age' means all compensation for employment." LE § 3-301(d)(1). The MEPEWA describes a number of circumstances in which differentiation in wages paid to individual employees of different sexes or gender identities does not constitute discrimination, such as merit or seniority systems or jobs requiring different skills, so long as such circumstances themselves are not premised on discrimination by sex or gender identity. See LE § 3-304(c). None of these exceptions concern religious entities. See id.

The MEPEWA "was patterned after the Federal Equal Pay Act[.]" Gaskins v. Marshall Craft Assocs., Inc., 110 Md. App. 705, 709 n.1, 678 A.2d 615, 617 n.1 (1996). As with the MFEPA, courts interpret the MEPEWA consistent with its federal corollary, absent "legislative intent to the contrary[.]" See Chappell, 320 Md. at 494, 578 A.2d at 772 (1990); see also Cohens v. Md. Dep't of Hum. Res., 933 F.Supp.2d 735, 745 (D. Md. 2013) (observing that "courts have applied the same analysis" to claims under the MEPEWA and the federal Equal Pay Act, because the Maryland law "essentially mirrors" the federal one) (internal quotation marks omitted). However, the original iteration of the MEPEWA only covered employers not covered by the federal law. See Taskforce on the Interrel. of Md./Fed. Empl. Stands., Div. of Lab. & Indus., An Evaluation of the Interrelationship of Maryland/Federal Employment Standards 124 (1978). In 1979, the General Assembly amended the MEPEWA to include employers covered by the federal

- 36 -

law.  See 1979 Md. Laws 859 (Ch. 237, S.B. 246).  By using the same language and framework for the MEPEWA as the federal law, the General Assembly revealed an intent that "[t]he state and federal equal pay laws have the same intent and apply the same employment standards."  Taskforce, supra, at 124; see also 1991 Md. Laws 303-04 (Ch. 8, H.B. 1) (recommending that the General Assembly continue to "amend [MEPEWA] to parallel the federal statute so that . . . Maryland statute could draw on the body of federal case law that has developed[.]").  In 2016, the General Assembly expanded the MEPEWA "to prohibit wage discrimination based on gender identity[.]"  Fiscal and Policy Note for SB 481, 1 (2016); 2016 Maryland Laws 6626-27 (Ch. 556 , SB 481).

As with the MFEPA, I would find the analysis of the Supreme Court of the United States in Bostock persuasive for interpreting the MEPEWA.  A woman in Mr. Doe's shoes, employed by CRS and seeking spousal benefits for her male spouse, would receive the benefits.  In contrast, as a man, Mr. Doe does not.  Therefore, CRS discriminated under the MEPEWA by denying Mr. Doe spousal benefits on the basis of sex, because CRS compensated him at a rate less than the rate paid to employees of another sex, *i.e.*, women, in the same situation, *i.e.*, married to men.  Sex is inseparable from CRS's decision to deny Mr. Doe his spousal benefits.

There is no dispute that the spousal benefits at issue are within the definition of "a wage" in the MEPEWA, see LE § 3-301(d)(1), because they are part of the compensation provided by CRS to employees.  Nor is there any dispute that Mr. Doe and his female colleagues who are similarly married to men are "both employees [who] work in the same establishment and perform work of comparable character or work on the same operation,

in the same business[.]"  See LE § 3-304(b)(1)(i).  Nor do any of the exceptions in LE § 3-304(c) apply.

Although LE § 3-304(b)(1)(i) references "employees" in the plural as part of its bar on discrimination in wages, this does not make the Bostock, 140 S. Ct. at 1740-41, reasoning inapplicable due to its interpretation of "discrimination" as focused on the "individual" rather than a group.  This is because the language in LE § 3-304(b)(1)(i) also contemplates differences in wages between just two individual employees (rather than treating employees as groups based on sex) when it states that an employer cannot differ employees' wages based on sex "if *both* employees work in the same establishment and perform work of comparable character or work in the same operation[.]"  (Emphasis added).  The plain meaning of "both" refers to two individuals and would not refer to two classes of employees in this context.  See *Both*, Merriam-Webster https://www.merriam-webster.com/dictionary/both [https://perma.cc/7477-C2LN].  Additionally, other paragraphs in the same section refer to employee in the individual sense.  See LE § 3-304(b)(2) ("an employee shall be deemed to work at the same establishment as another employee"); LE § 3-304(a)(1) ("assigning or directing the employee into a less favorable career track . . . or position"); LE § 3-304(a)(3) ("limiting or depriving an employee of employment opportunities").  As with Title VII, the language of MEPEWA reflects "key drafting choices—to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries—virtually guarantee[ing] that unexpected applications would emerge over time." See Bostock, 140 S. Ct. at 1753.

The General Assembly's inclusion of gender identity as an impermissible ground for discrimination in the context of the MEPEWA does not mean that discrimination on that basis is different than discrimination based on sex.[20] Rather, the 2016 amendment served to clarify that disparities in employee compensation based on gender identity are to be treated the same as those based on sex. Although the General Assembly's decision to add sexual orientation to the MFEPA but not MEPEWA could support an interpretation consistent with CRS's, that is not enough to overcome the plain text of the statute and what flows from it: discrimination based on sexual orientation necessarily is discrimination based on sex. The Supreme Court declined to adopt a similar line of reasoning in Bostock, 140 S. Ct. at 1747, where the employers contended that Congress had considered, but not approved, "several proposals to add sexual orientation to Title VII's list of protected characteristics," while enacting "other statutes addressing other topics that do discuss sexual orientation." Such "postenactment legislative history" did not sway the Supreme Court, because "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." Id. (citations omitted). Instead of venturing into such dangerous territory, I would agree with CRS that sex has the same meaning in both the MFEPA and the MEPEWA, although not the meaning that CRS gives it.

Mr. Doe's references to the "Guidelines on Employee Selection Procedure" created

---

[20]The General Assembly amended the MEPEWA to include gender identity in 2016, two years after amending the MFEPA to include gender identity, in 2014. See 2014 Md. Laws 3123 (Ch. 474, SB 212).

and distributed by the State to aid in interpreting the statutes support my interpretation. The guidelines explain that employer policies regarding marital status could constitute discrimination based on sex. CRS's policy of distinguishing between women married to men and men married to men in the provision of spousal benefits is not so far removed from the guidelines' admonition against policies discriminating between married and unmarried women and men regarding benefits.

In sum, I would answer the certified questions from the United States District Court for the District of Maryland as follows.

> 1. The prohibition against sex discrimination in the MFEPA, SG § 20-606, prohibits discrimination on the basis of sexual orientation.
>
> 2. Under SG § 20-604(2), the application of the exemption from MFEPA for a religious corporation, association, educational institution, or society with respect to employment of an individual of a particular sexual orientation to perform work connected to the religious entity's activities does not bar all claims of sexual orientation discrimination. Rather, the exemption bars claims of sexual orientation discrimination with respect to the hiring, engaging, or terminating of employment of an individual of a particular sexual orientation to perform work where having an employee of a certain sexual orientation perform the employee's job duties would affect the religious entity's ability to carry out its essential activities. In this case, the denial of spousal benefits on the basis of sexual orientation to an employee responsible for data analysis and business platform support falls outside of the ambit of the exemption and therefore the MFEPA applies.
>
> 3. The prohibition against sex discrimination in the MEPEWA, LE § 3-304, prohibits discrimination on the basis of sexual orientation.
>
> For the above reasons, respectfully, I dissent.
>
> Justice Eaves has authorized me to state that she joins in this opinion.

U.S. District Court for the District of Maryland
Case No. CCB-20-1815
Argued: June 2, 2023

IN THE SUPREME COURT

OF MARYLAND*

Misc. No. 28

September Term, 2022

_____

JOHN DOE

v.

CATHOLIC RELIEF SERVICES

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Dissenting Opinion by Hotten, J. which,
Eaves, J., joins.

_____

Filed: August 14, 2023

*During the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

No union is more profound than marriage, for it embodies the highest ideals of love, fidelity, devotion, sacrifice, and family. In forming a marital union, two people become something greater than once they were. . . . [M]arriage embodies a love that may endure even past death. It would misunderstand these men and women to say they disrespect the idea of marriage. Their plea is that they do respect it, respect it so deeply that they seek to find its fulfillment for themselves. Their hope is not to be condemned to live in loneliness, excluded from one of civilization's oldest institutions. They ask for equal dignity in the eyes of the law. The Constitution grants them that right.

*Obergefell v. Hodges*, 576 U.S. 644, 681, 135 S. Ct. 2584, 2608 (2015).

I respectfully dissent. With just over three years since the United States Supreme Court's decision in *Bostock v. Clayton County*, ___ U.S. ___, 140 S. Ct. 1731 (2020), this case presents Maryland with the unique opportunity to be one of the first states to consider the extent to which *Bostock* plays a role in the interpretation and interplay of two state anti-discrimination statutes, the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Government ("State Gov't") § 20-601–611, and the Maryland Equal Pay for Equal Work Act ("MEPEWA"), Md. Code Ann., Labor and Employment ("Lab. & Empl.") § 3-301–309. The majority's decision is inconsistent with federal law, contrary to how Maryland interprets such statutes, and undermines public policy.

I would answer the certified questions as follows: (1) MFEPA's prohibition against sex discrimination includes discrimination on the basis of sexual orientation; (2) MFEPA's religious exemption does not extend to employment activities that are not religious in nature; and (3) MEPEWA prohibits discrimination on the basis of sex or gender identity, *including* sexual orientation.

As the majority explained, the certified questions require the interpretation of two Maryland anti-discrimination statutes, MFEPA and MEPEWA. We conduct a statutory analysis of MEPEWA and MFEPA abiding by our "[w]ell-settled principles of statutory construction[.]" *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 178, 286 A.3d 1, 12 (2022).

**A.    The Maryland Fair Employment Practices Act**

Under MFEPA, an employer[1] may not "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of [] the individual's race, color, religion, sex, age, national origin, marital status, *sexual orientation*, gender identity, genetic information, or disability[.]" State Gov't § 20-606(a)(1) (emphasis added). The General Assembly provided clear public policies for MFEPA, including "the protection of [] public

---

[1] MFEPA defines an "[e]mployer" as:

(i) a person that:

1. is engaged in an industry or business; and

2. A. has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; or

B. if an employee has filed a complaint alleging harassment, has one or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year[.]

State Gov't § 20-601(d)(1)(i). An "[e]mployee" means "an individual employed by an employer[.]" *Id.* § 20-601(c)(1)(i). Catholic Relief Services ("CRS") meets the statutory definition of an employer.

safety, public health, and general welfare, [] the maintenance of business and good government, and [] the promotion of the State's trade, commerce, and manufacturers[.]" *Id.* § 20-602. MFEPA "does not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." *Id.* § 20-604(2).

As a preliminary matter, the plain language of MFEPA clearly prohibits sexual discrimination on the basis of sexual orientation. Neither party nor the majority contends otherwise. Maj. Op. 9. Sexual orientation is included in the statutory language and statutorily defined. *See* State Gov't §§ 20-606(a)(1), 20-101(i) (defining "[s]exual orientation" as "the identification of an individual as to male or female homosexuality, heterosexuality, or bisexuality.").

The majority correctly observes that "sex" is not statutorily defined in MFEPA. Maj. Op. 9. Relying upon various dictionary definitions, including a 1966 definition, the majority concludes that "[t]he [ ] definition of 'sex'—both at the time MFEPA was enacted . . . and currently—" does not "signal that 'sex' also includes 'sexual orientation.'" *Id.* at 9–10. According to the majority, such a "reading" would render MFEPA's religious entity exemption "a nullity[]" because "[e]very plaintiff who sued a religious entity employer for alleged sexual orientation discrimination would simply plead their claim as a sex discrimination claim to avoid the potential application of the religious entity exemption." *Id.* at 10–11. Both CRS and the majority argue that "if the General Assembly had believed that sexual orientation discrimination was also covered under sex discrimination, it

3

presumably would have made that clear in some fashion when adding sexual orientation to the religious entity exemption." *Id.* at 14. I disagree.

In 2020, the United States Supreme Court addressed the issue of whether Title VII prohibits employment discrimination based on sexual orientation or transgender status. *Bostock v. Clayton Cnty.*, ___ U.S. ___, 140 S. Ct. 1731 (2020). *Bostock* dealt with three employees who were fired shortly after the employees revealed to their employers that they are gay "or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status." *Id.* at ___, 140 S. Ct. at 1737. Gerald Bostock, a gay man, was employed by Clayton County, Georgia, as a child welfare advocate. *Id.*, 140 S. Ct. at 1737. "After a decade with the county, Mr. Bostock began participating in a gay recreational softball league." *Id.*, 140 S. Ct. at 1737. He was thereafter fired by the county "for conduct 'unbecoming' a county employee." *Id.* at ___, 140 S. Ct. at 1738. Donald Zarda, a gay employee, was employed as a skydiving instructor in New York. Mr. Zarda was subsequently fired days later after revealing that he was gay. *Id.*, 140 S. Ct. at 1738. Finally, Aimee Stephens was employed at a funeral home in Michigan. Ms. Stephens originally presented as a male, but later, after a clinical diagnosis, began "living as a woman." *Id.*, 140 S. Ct. at 1738. After six years with the company, Ms. Stephens was thereafter fired by the funeral home, telling her that "'this is not going to work out.'" *Id.*, 140 S. Ct. at 1738. All three employees filed suit against their employers under Title VII for unlawful discrimination on the basis of sex. *Id.*, 140 S. Ct. at 1738.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer[2] to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,[3] because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C.A. § 2000e-2(a)(1). The central question in *Bostock* was whether Title VII's prohibition of employment discrimination "'because of . . . sex,'" encompasses sexual orientation and gender identity. *Bostock*, ___ U.S. at ___, 140 S. Ct. at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). The United States Supreme Court examined the text, history, and purpose of Title VII and ultimately concluded that discrimination based on sexual orientation and transgender status is a form of sex discrimination. *Id*. at ___, 140 S. Ct. at 1741. Justice Gorsuch, writing for the majority, clarified that, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex. . . . [T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id*. at ___, 140 S. Ct. at 1741–42. For an employer to discriminate on the basis of sexual orientation or transgender status, "the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex." *Id*. at ___, 140 S. Ct. at 1742. This is "exactly

---

[2] Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person[.]" 42 U.S.C.A. § 2000e(b). This language is nearly identical to the definition of employer under MFEPA.

[3] Health insurance qualifies as "'compensation, terms, conditions, or privileges of employment[]'" under Title VII. *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682, 103 S. Ct. 2622, 2630 (1983) (quoting 42 U.S.C.A. § 2000e-2(a)(1)).

what Title VII forbids." *Id.* at ___, 140 S. Ct. at 1737. Thus, the United States Supreme Court expanded Title VII's ban on "sex" discrimination to encompass sexual orientation and gender identity.[4] *Id.* at ___, 140 S. Ct. at 1744.

In light of *Bostock*, I disagree with the majority that MFEPA's prohibition against sex discrimination does not extend to discrimination on the basis of sexual orientation.[5] Notwithstanding *Bostock's* expansion of "sex" discrimination, the addition of the phrase "sexual orientation" in MFEPA's religious exemption—but not "sex"—expressly affirmed the protections that were already available under the prohibition against sex discrimination. The addition of "sexual orientation" did not divest "sex" discrimination of its meaning. The dictionary definition of "sex" is "just a starting point." *Id.* at ___, 140 S. Ct. at 1739. The meaning of "sex," as recognized in *Bostock*, necessarily means that there will be some overlap between the "sex" discrimination and "sexual orientation" discrimination. *Id.* at ___, 140 S. Ct. at 1737 (recognizing that "[s]ex plays a necessary and undisguisable role in the decision[]" to fire someone based on their sexual orientation).

---

[4] Following *Bostock*, the Equal Employment Opportunity Commission ("EEOC") updated their enforcement guidance to reflect the *Bostock* decision and its interpretation of Title VII's protections. *Compliance Manual on Religious Discrimination*, EEOC (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref65, *archived at* https://perma.cc/7QYC-9PFR; *Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity*, EEOC (June 15, 2021), https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender, *archived at* https://perma.cc/5HRJ-32Z6.

[5] The majority admits that its decision may cause the General Assembly to "amend MFEPA in some fashion to harmonize it with the holding of *Bostock*." Maj. Op. 15.

Contrary to the majority's contention, such an interpretation does not ignore the "purpose of the statute's religious entity exception." Maj. Op. 10. MFEPA's religious exemption, State Gov't § 20-604(2), exempts discrimination claims against "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." A claim of sexual orientation discrimination cannot circumvent the clear religious exemption, regardless of whether it invokes MFEPA's prohibition against discrimination based on either "sex" or "sexual orientation[.]" This is because both claims pertain to sexual orientation discrimination. That overlap is a natural consequence of one enumerated protection being broader than the other. Therefore, interpreting "sex" discrimination under MFEPA to include sexual orientation discrimination both comports with *Bostock* and the plain language of the religious exemption.

The issue lies not in to *whom* the statute applies, *i.e.*, "individuals of a particular . . . sexual orientation," but to *what*, *i.e.*, "work connected with the activities of the religious entity." State Gov't § 20-604(2). The statute does not clarify what it means "to perform work connected with the activities of the religious entity." *Id.* As the majority recognizes, this phrasing could "reasonably be read as limiting the application of the exemption based on the type of work performed by the employee[,]" or read broadly to include *all* "work" or "activities[.]" Maj Op. 24. Accordingly, I agree with both John Doe and the majority that the exemption is ambiguous.

MFEPA's legislative history is instructive. MFEPA was introduced to the General Assembly as Senate Bill 212 ("SB 212"). The Fiscal and Policy Note for SB 212 clearly explains the evolution of Title VII and how federal courts have interpreted Title VII in relation to gender identity. Dep't Legis. Servs., *Revised Fiscal and Policy Note*, *SB 212*, at 2 (2014 Session) ("SB 212 Revised Fiscal and Policy Note"). SB 212 Revised Fiscal and Policy Note then goes on to explain how other states, including Maryland, "have passed laws prohibiting discrimination based upon gender identity." Accordingly, it is clear that the General Assembly considered Title VII when drafting and enacting MFEPA.

As CRS observes, there is only one published Maryland case, *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 770 A.2d 111 (2001), that has "construed MFEPA's religious employer exemption[.]" Contrary to the facts before us, *Montrose* turned on whether a local Montgomery County ordinance, which prohibited employment discrimination on the basis of, among other things, "religious creed," but provided an exception for those employees "*perform[ing] purely religious functions*[,]" conflicted with Maryland's then-employment discrimination law, which is now MFEPA. *Id.* at 570–71, 578, 770 A.2d at 115, 118–19 (internal quotation marks and citation omitted). We held that it did not. *Id.* at 581, 770 A.2d at 120. Nonetheless, we clarified that MFEPA "was modeled after the federal anti-discrimination law," Title VII, which "provid[ed] the same broad exemption for religious organizations." *Id.* at 580, 770 A.2d at 120 (citation omitted).

In *Chappell v. Southern Md. Hosp., Inc*., we similarly explained that:

8

> In the absence of legislative intent to the contrary, we read [MFEPA] of the state act in harmony with § 2000e–3(a) of the federal statute, and therefore construe the two provisions to fulfill the same objectives. In this regard, we may look to court decisions interpreting § 2000e–3(a).
>
> * * *
>
> *As [MFEPA] tracks the language of [Title VII], we think it likely that these same criteria would determine whether a prima facie violation of the state law was established.*

320 Md. 483, 494–96, 578 A.2d 766, 772–73 (1990) (emphasis added); *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011) ("Title VII is the federal analog to [MFEPA] and our courts traditionally seek guidance from federal cases in interpreting [MFEPA.]" (internal quotation marks and citation omitted)).

Since "[t]here are relatively few appellate decisions interpreting [MFEPA][,]" Maryland courts look to federal courts, including the United States Supreme Court, on the interpretation and application of Title VII to interpret and apply MFEPA. *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 209, 137 A.3d 211, 217 (2016) (noting that MFEPA is modeled after Title VII) (citations omitted); *Town of Riverdale Park v. Ashkar*, 474 Md. 581, 615, 255 A.3d 140, 159 (2021) ("This Court has recognized that Title VII is the federal analog to [MFEPA] and has expressly been guided by cases from the United States Supreme Court in resolving discrimination claims arising under Maryland law." (citation omitted)); *Schwenke v. Ass'n of Writers & Writing Programs*, 510 F. Supp. 3d 331, 336 (D. Md. 2021) ("[T]he elements of [MFEPA and Title VII] claim[s] are the same, with the expansion of Title VII to include, in its definition of sex discrimination, protections already made in explicit under Maryland Law[.]"); *Montrose Christian Sch. Corp.*, 363 Md. at 580,

9

770 A.2d at 120 (noting that the then-employment discrimination law, which is now MFEPA, "was modeled after the federal anti-discrimination law," Title VII).

CRS cites to *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 914 A.2d 735 (2007), to support the contention that this Court has previously "declined to follow federal case law" construing Title VII when interpreting Maryland statutory law. In *Haas*, this Court noted that the intermediary appellate court "sidestepped" "the familiar command to effectuate the plain meaning of the [statutory] language" at issue. *Id.* at 492, 914 A.2d at 749 (citations omitted). We explained that, "[w]hile it certainly is permissible to have recourse to federal law similar to our own as an aid in construction of Maryland statutory law, it should not be a substitute for the pre-eminent plain meaning inquiry of the statutory language under examination." *Id.*, 914 A.2d at 749 (citations omitted). Unlike *Haas*, I have not "sidestepped" our principles of statutory interpretation here. As explained above, the MFEPA's religion exemption is ambiguous.

Nonetheless, *Haas* does not stand for the proposition that Maryland courts should not consider analogous federal case law. Rather, we explained that parallel federal laws "are relevant authorities because our courts *traditionally seek guidance from federal cases in interpreting Maryland[] [laws], [but] they do not bind us here*." *Id.* at 481, 914 A.2d at 742 (emphasis added) (footnote omitted). Whether we decide to construe state statutes, rules, or constitutional provisions differently or similarly from their federal analogues seems to be a factual determination. *Id.* at 481 n.10, 914 A.2d at 742 n.10. The dissent in *Haas* aligns with our view here: "Considering the mimicry of state and local laws to Title VII, it is appropriate to consider federal precedents when interpreting state and local laws."

10

*Id.* at 504, 914 A.2d at 756 (Battaglia & Raker, JJ., dissenting). I, therefore, examine Title VII to assist in construing MFEPA.[6]

Like MFEPA, Title VII includes a statutory religious exemption. 42 U.S.C.A. § 2000e-1(a). The language in MFEPA's religious exemption is similar to that of Title VII's. *Compare* State Gov't § 20-604(2) ("This subtitle does not apply to: . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity *to perform work connected with the activities of the religious entity*. (emphasis added)), *with* 42 U.S.C.A. § 2000e-1(a) ("This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion *to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities*." (emphasis added)). The key—yet ambiguous—language is the latter portion of the statutory language: "to perform work connected with the activities of the religious entity." State Gov't § 20-604(2).

It is clear that such an exemption only applies where a nexus exists between the employer's religious activities and the work that an employee performs—regardless of the form of discrimination. The majority offers that, "in order for the exemption to apply, the employee's duties must directly further the core mission(s)–religious or secular, or both– of the religious entity." Maj. Op. 31. It even provides a non-exhaustive list of factors for

---

[6] The majority itself acknowledges the "'similarities[]'" between Title VII and MFEPA, recognizing that MFEPA was, in fact, modeled after Title VII. Maj. Op. 11–12 (quoting *Molesworth v. Brandon*, 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996)).

11

courts to consider "in determining the core mission(s) of a religious entity for purposes of" MFEPA. *Id.* at 31–33. I agree that the latter half of MFEPA's religious exemption "can reasonably be read as limiting the application of the exemption based on the type of work performed by the employee[,]" *id.* at 24, but I do not believe the majority's standard provides the exemption "its narrowest reasonable reading," *id.* at 23.

After *Bostock*, Title VII's exemption allows employers to consider "individuals of a particular religion" who perform work "connected with" the activities of the employer, but not to discrimination based on race, sex, national origin, *and* sexual orientation. The *Bostock* Court understood the potential repercussions of its ruling:

> [T]he employers fear that complying with Title VII's requirement . . . may require some employers to violate their religious convictions. We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution . . . [, b]ut worries about how Title VII may intersect with religious liberties are nothing new[.] . . . [H]ow these doctrines protecting religious liberty interact with Title VII are questions for future cases[].

*Bostock*, ___ U.S. at ___, 140 S. Ct. at 1753–54. Writing for the dissent, Justice Alito acknowledged that the broadening of Title VII and its religious exception likely offers religious employers "only narrow protection." *Id.* at ___, 140 S. Ct. at 1781 (Alito, J., dissenting) (footnote omitted). In my view, interpreting the scope of the religious exemption requires recognizing why the religious exemption exists in the first place, *i.e.*, to accommodate religious beliefs and activities. It is dubious that religious objections have any place in the realm of secular activities because anyone can complete those tasks under any other employer. Instead, there must be something inherent about the employee's obligations that warrants distinguishing them from responsibilities they would have

12

elsewhere. Properly construed, the religious exemption provides that this "something" is a religious element. In light of those limiting principles, it's improper to interpret the General Assembly's insertion of "sexual orientation" to mean that the General Assembly would provide religious employers, such as CRS, *carte blanche* to discriminate based on sexual orientation. Such an interpretation would undermine the purpose of MFEPA, which is to "assure all persons equal opportunity in receiving employment . . . regardless of . . . sex, . . . sexual orientation, [or] gender identity, . . . and [] to that end, to prohibit discrimination in employment by any person." State Gov't § 20-602. Considering the purpose of MFEPA, it is unlikely the General Assembly sought to "confer upon [CRS] a license" to make hiring decisions on the basis of sex, sexual orientation, or gender identity. *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985).

Finally, the majority's interpretation of MFEPA's religious exemption seemingly violates Article 36 of the Maryland Declaration of Rights.[7] Through Article 36, Maryland guarantees the free exercise of religion, providing that "all persons are equally entitled to protection in their religious liberty[.]"[8] Md. Const. Decl. of Rts. art. 36. Article 36 further

---

[7] Whether MFEPA's religious exemption violates Mr. Doe's rights under Article 36 of the Maryland Declaration of Rights is a question the majority also declined to address and left for the federal court to answer. Maj. Op. 33–34.

[8] Article 36 of the Maryland Declaration of Rights provides in full:

> That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion,

(continued . . .)

13

states, in relevant part, that "no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, *unless, under the color of religion, he shall . . . injure others in their natural, civil or religious rights*[.]" *Id.* (emphasis added). The emphasized language reflects a clear limitation to Article 36's guarantee of free exercise.

As we explained in *Montrose*, "Article 36 . . . ordinarily do[es] not grant to . . . a religious organization a constitutional right to ignore neutral laws of general applicability even when such laws have an incidental effect of burdening a particular religious activity." 363 Md. at 585, 770 A.2d at 123; *Archdiocese of Washington v. Moersen*, 399 Md. 637, 640–41, 925 A.2d 659, 661 (2007) (citations omitted). While the "[f]reedom to believe is absolute, *[the] freedom to act is not*." *Hopkins v. State*, 193 Md. 489, 496, 69 A.2d 456, 459 (1949) (emphasis added). One "cannot, under the guise of religious conviction,

_____

(. . . continued)

> he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief, provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.

> Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.

> Nothing in this article shall constitute an establishment of religion.

14

disobey the laws of the land made for the protection of the health and safety of society." *Craig v. State*, 220 Md. 590, 600, 155 A.2d 684, 690 (1959). Thus, free exercise may be reasonably limited "for the protection of society[]" and to avoid "invading" protected constitutional liberties. *Hopkins*, 193 Md. at 496, 69 A.2d at 459.

Article 36 does not permit CRS to avoid MFEPA, a neutral and generally applicable law. *See Montrose*, 363 Md. at 585, 770 A.2d at 123; *Moersen*, 399 Md. at 640–41, 925 A.2d at 661. Post-*Bostock*, Title VII's religious exemption does not allow employers to discriminate based on sex, including sexual orientation and gender identity. *Bostock*, ___ U.S. at ___, 140 S. Ct. 1731 at 1744. I apply the same reasoning to MFEPA's religious exception. Accordingly, CRS arguably, "under the color of religion, . . . injure[d] [Mr. Doe] in [his] [] civil . . . rights[.]" Md. Const. Decl. of Rts. art. 36. At minimum, our decision today raises concerns surrounding the General Assembly's power to enact legislation that, while intended to protect against discrimination, carves out a religious exemption at the expense of another's "natural, civil or religious rights[.]" *Id.*

## B.     The Maryland Equal Pay for Equal Work Act

We now turn to MEPEWA, the focus of certified question 3. MEPEWA generally prohibits wage discrimination based on sex or gender identity. Lab. & Empl. § 3-304(b)(1). Specifically, "[a]n employer[9] may not[:]" (1) "pay[] a wage[10] to employees of one sex or

---

[9] MEPEWA defines an "[e]mployer" as "a person engaged in a business, industry, profession, trade, or other enterprise in the State[.]" Lab. & Empl. § 3-301(b)(1). CRS meets the definition of employer under MEPEWA.

[10] MEPEWA defines "[w]age" broadly and inclusively as "*all* compensation for employment[,]" including "board, lodging, or other advantage provided to an employee for

15

gender identity[11] at a rate less than . . . employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character or work" or (2) "provid[e] less favorable employment[12] opportunities based on sex or gender identity." *Id.* MEPEWA contains exceptions relating to seniority, shifts, merit systems, ability, skills, and performance-based measures. *See id.* § 3-304(c). Unlike MFEPA, it does not contain a religious exception. "If an employer knew or reasonably should have known that the employer's action violates [MEPEWA], an affected employee may bring an action against the employer for injunctive relief and to recover actual damages and . . . liquidated damages." *Id.* § 3-307(a)(1), (2).

Unlike MFEPA, MEPEWA mentions "sex [and] gender identity" but does not expressly mention sexual orientation. Lab. & Empl. § 3-304. MEPEWA explicitly defines "gender identity" under State Gov't § 20-101(d), and, as previously discussed, "sexual orientation" is defined under State Gov't § 20-101(i). Indeed, it is curious why MEPEWA

---

the convenience of the employer." *Id.* § 3-301(d) (emphasis added). Thus, health benefits fall under the statutory definition.

[11] Under MEPEWA, "[g]ender identity" means:

> [T]he gender-related identity, appearance, expression, or behavior of a person, regardless of the person's assigned sex at birth, which may be demonstrated by: (1) consistent and uniform assertion of the person's gender identity; or (2) any other evidence that the gender identity is sincerely held as part of the person's core identity.

State Gov't § 20-101(e).

[12] "[P]roviding less favorable employment opportunities" includes "limiting or depriving an employee of employment opportunities that would otherwise be available to the employee but for the employee's sex or gender identity." Lab. & Empl. § 3-304(a)(3).

16

does not also reference "sexual orientation" under State Gov't § 20-101(i). Thus, as CRS and the majority contends, one can interpret the plain language to mean that sexual orientation was intentionally omitted as a protected category in MEPEWA. Maj. Op. 18. Such an intention, the majority asserts, is evidenced by the General Assembly's failure to include sexual orientation as a protected category when MEPEWA was amended in 2016. *Id.* at 19. The statute's legislative history and underlying policy, however, indicates otherwise.

MEPEWA was introduced to the General Assembly as House Bill 1003 ("HB 1003"). The Revised Fiscal and Policy Note for HB 1003 discusses the federal Equal Pay Act ("EPA"). *See* Dep't Legis. Servs., *Revised Fiscal and Policy Note*, *HB 1003*, at 4–5 (2016 Session) ("HB 1003 Revised Fiscal and Policy Note"). HB 1003 Revised Fiscal and Policy Note then goes on to explain the role of the EEOC. *Id.* Accordingly, it is apparent that the General Assembly relied upon the EPA when drafting MEPEWA. Likewise, courts have consistently held that MEPEWA "mirrors" that of its federal counterpart, the EPA. *Raines v. Am. Fed'n of Tchrs. – Md. Pro. Emps. Council, AFL-CIO Loc. 6197*, No. CV ADC-19-1266, 2019 WL 4467132, at *10 (D. Md. Sept. 18, 2019) (internal quotation marks and citations omitted); *Cohens v. Md. Dep't of Hum. Res.*, 933 F. Supp. 2d 735, 745 (D. Md. 2013) (quoting *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 862 (D. Md. 2000)); *Gaskins v. Marshall Craft Assocs., Inc.*, 110 Md. App. 705, 709 n.1, 678 A.2d 615, 617 n.1 (1996) ("The [MEPEWA] . . . was patterned after the [EPA][.]"); *Nixon v. State*, 96 Md. App. 485, 490 n.3, 625 A.2d 404, 406 n.3 (1993). Again, this Court reads MEPEWA "in harmony" with the EPA, and "construe[s] the two provisions to fulfill the

17

same objectives." *Chappell*, 320 Md. at 494–96, 578 A.2d at 772–73. We, therefore, examine the EPA to help construe MEPEWA.

The EPA prohibits discrimination "on the basis of sex by paying wages to employees . . . at a rate less than the rate . . . [paid] to employees of the opposite sex . . . for equal work[.]" 29 U.S.C.A. § 206(d)(1). The EPA is often construed with Title VII because Title VII provides, in part, that "[i]t shall not be an unlawful employment practice . . . for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid . . . to employees . . . if such differentiation is authorized by [29 U.S.C.A. § 206(d)][,]" the EPA. 42 U.S.C.A. § 2000e-2(h). As previously discussed, *Bostock* expanded "sex" discrimination to encompass sexual orientation and gender identity. *Bostock*, ___ U.S. at ___, 140 S. Ct. at 1742 ("[H]omosexuality and transgender status are inextricably bound up with sex."). I agree with Mr. Doe that it is unlikely the General Assembly intended to allow religious employers to "discriminate in compensation on the basis of sexual orientation, placing MEPEWA squarely at odds with MFEPA's protections." The thread that weaves through each statute is equality. As the majority recognizes, MEPEWA and MFEPA are "two common schemed statutes . . . work[ing] to remedy forms of employment discrimination." Maj. Op. 20 (internal quotation marks and citation omitted). Despite this, the majority seemingly finds its hands tied: "If we were to read the prohibition against sex discrimination under MEPEWA to include a prohibition against sexual orientation discrimination, then we would need to interpret the prohibition against sex discrimination the same way under MFEPA, which we have declined to do[.]" *Id*. Such an interpretation, the majority

18

contends, would overstep the role of judiciary. *Id.* at 21. I disagree. Surely, the General Assembly recognized this when it drafted MEPEWA and sought to harmoniously achieve the same objectives as MFEPA. This case presented us with the opportunity to harmonize the two statutes, but the majority's decision renders them incongruous. Such an interpretation is also at odds with *Bostock*.

In *Bostock*, the United States Supreme Court addressed the employers' argument that—a position which CRS and the majority also makes here—because homosexuality and transgender status can't be found on Title VII's list of protected characteristics, "they are implicitly excluded from Title VII's reach. . . . [I]f Congress had wanted to address these matters in Title VII, it would have referenced them specifically."[13] *Bostock*, ____ U.S. at ___, 140 S. Ct. at 1746 (citations omitted). The United States Supreme Court rejected this assertion, recognizing that:

> [D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; *the first cannot happen without the second*. Nor is there any such thing as a "canon of donut holes," in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, *when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule*. And that is exactly how this Court has always approached Title VII. . . . As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them.

---

[13] It is worth noting that the dissent agreed with the employers, noting that Title VII's list of protected characteristics does not *expressly* include sexual orientation or gender identity. *Bostock*, ___ U.S. at ___, 140 S. Ct. at 1754–55 (Alito, J., dissenting). This is the position taken by the majority here. Maj. Op. 19.

19

*Id.* at \_\_\_, 140 S. Ct. at 1747 (emphasis added). I, therefore, agree with the District Court for the District of Maryland's conclusion that Mr. Doe "made a prima facie case of sex-discrimination under the [] EPA." *Doe v. Catholic Relief Services*, 618 F. Supp. 3d 244, 257 (D. Md. 2022). Indeed, CRS discriminated against Mr. Doe when it "intentionally discriminate[d] against [him] . . . because of sex." *Bostock*, \_\_\_ U.S. at \_\_\_, 140 S. Ct. at 1744. I would hold that MEPEWA also prohibits discrimination on the basis of sexual orientation.

## CONCLUSION

For these reasons, I respectfully dissent to the majority's answers to certified questions. The prohibition against discrimination on the basis of race, color, religion, ancestry, national origin, sex, age, marital status, gender identity, disability, or sexual orientation has to mean something relative to the prohibition expressed by MFEPA and MEPEWA. It should not lead us to open the door for further discrimination and inequality. The overarching promise of justice and fairness must reflect a sentiment of equality that is consistent with what is right under the law. Discrimination on the basis of sexual orientation constitutes a deprivation the same as the categories referenced above. The spirit of equality and justice must remain paramount. Justice Eaves has authorized me to state that she joins in this opinion.